**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHL VARIABLE INSURANCE COMPANY, <br><br>             Plaintiff, <br><br> v. <br><br> TOWN OF OYSTER BAY <br><br>           Defendant. | Civil Action No.  2:16-cv-4013 <br><br><br><br><br> July 19, 2016 |

PHL Variable Insurance Company ("**PHL**"), by and through its undersigned attorneys, Locke Lord, LLP, for its complaint against the Town of Oyster Bay ("**TOBAY**"), alleges as follows:

## I.  PARTIES

1.  Plaintiff PHL is a corporation organized under the laws of, and maintains its principal place of business in, the state of Connecticut.

2.  Defendant TOBAY is a New York municipality and, for purposes of diversity jurisdiction, is considered to be a citizen of the state of New York.

## II.  JURISDICTION AND VENUE

3.  This Court has jurisdiction over this matter pursuant to 28 *U.S.C.* § 1332, as a result of the complete diversity of citizenship existing between PHL and TOBAY and because the amount in controversy, exclusive of interest and costs, exceeds the jurisdictional sum of $75,000.00.

AM 57468927.1

4.      Venue is proper in this district pursuant to 28 *U.S.C.* §1391 (b) (1) and (2), respectively, because the only defendant, TOBAY, "resides" within this district and, further, because a substantial part of the events giving rise to PHL's claims occurred in this district.

III.    **FACTUAL BACKGROUND**

5.      TOBAY is a town located within Nassau county, New York with a reported 2010 census population of 293,214.

6.      TOBAY, as part of its governmental functions, and to serve the needs of its citizenry, provides its residents with a wide variety of recreational opportunities.  In particular, but not by way of limitation, TOBAY maintains at least eight (8) town beaches, four (4) town pools, an athletic center, a skating rink, and a number of municipal parks.

7.      These recreational activities promote the health and well-being of TOBAY's residents and are an important part of the community "fabric" of TOBAY.   Indeed, the importance of these activities to the community is perhaps best measured by the fact that, of TOBAY's annual 2015-2016 $289,605,515 budget, at least $34,533,881, or roughly twelve percent (12%), was allocated to the provisioning of these services.   By way of contrast, TOBAY's "public safety" 2015-2016 budget allocations were a mere $4,408,683 (or roughly 1.5%), with additional "fire protection" allocations of $8,030,418 (or about 2.8%).

8.      In addition to the recreational facilities referenced above, TOBAY also owns and operates a municipal golf course ("**Golf Course**"), which TOBAY itself touts as "nationally recognized."

AM 57468927.1

9.      The Golf Course is the site of several dining and concession facilities, including, but not limited to, those located at: (1) a restaurant, catering and banquet facility commonly known as "The Woodlands at Woodbury" ("**Woodlands**"); (2) "The Halfway House," a snack bar located on the 8th tee of the golf course; and (3) the driving range (the Woodlands, the Halfway House, and the concessions sited at the driving range and at all other locations within the Golf Course property are hereinafter collectively referred to as the "**Facilities**").

### *The Concession Agreement*

10.     The Woodlands houses a restaurant that is open to the public, and it is also available for event bookings such as weddings, birthdays, and the like.  The facility includes, among other things, a formal upstairs dining room, a formal downstairs dining room, a bar/lounge, and an outdoor terrace.

11.     Cognizant of the fact that, as a municipality, it lacked the requisite knowledge or expertise to operate the Facilities (and, in particular, Woodlands), TOBAY, on or about October 30, 2000, entered into a certain agreement with SRB Catering Corp. d/b/a H.R. Singleton's Classic American Grille ("**SRB**"), a true and accurate copy of which is attached hereto as Exhibit A ("*Concession Agreement*").

12.     Pursuant to the *Concession Agreement*, SRB was to operate the Facilities and to remit payments to TOBAY for the privilege of doing so.  Nevertheless, TOBAY exercised extensive control over SRB's activities.  In particular, the *Concession Agreement* regulated, among other things:

- The Facilities' hours of operation;

-3-

AM 57468927.1

- The provisioning of valet parking;

- The hiring and firing of SRB's employees, as well as their attire;

- Pricing;

- Advertising and signage;

- The provisioning of on-site management personnel; and

- Pouring rights.

13.     The *Concession Agreement* had a twenty year term, commencing on January 1, 2001 and ending on December 31, 2020.  It was also further subject to an option, exercisable by TOBAY, for one ten (10) year renewal.

14.     The *Concession Agreement* required SRB, during the first year of that term, to pay TOBAY an annual licensing fee of Forty Eight Thousand Dollars ($48,000), in equal monthly instalments of Four Thousand Dollars ($4,000).   For each subsequent year of the *Concession Agreement's* term, the annual license fee was increased by three percent (3%) over the previous year.

15.     The *Concession Agreement* also gave TOBAY the right, at its option, to elect to receive a percentage of SRB's gross receipts *in lieu* of the above-described license payments. In particular, TOBAY could require SRB to pay an annual license fee of five percent (5%) of annual gross receipts (assuming the same total $2,000,000 or less).   If those receipts exceeded Two Million Dollars ($2,000,000), SRB was then required to pay six percent (6%) of such receipts to TOBAY.

AM 57468927.1

16.     SRB was also required to make specific capital improvements to the Facilities (in particular, Woodlands) with a total value of approximately Two Million Ninety Seven Thousand Dollars ($2,097,000).  These improvements were to be made within the first three years of the *Concession Agreement's* term "pursuant to plans, specifications and a schedule approved by" TOBAY.  Upon their completion and acceptance, TOBAY would own all of these improvements.

17.     On or about April 19, 2005, TOBAY and SRB executed an amendment to the *Concession Agreement*, a true and accurate copy of which is attached hereto as <u>Exhibit B</u> ("**Amendment I**").  One of *Amendment I's* stated purposes was "to accept the major capital improvements heretofore performed by [SRB] to the [Woodlands], and to provide for future improvements."

18.     *Amendment I* stated that, by the time of its execution, SRB had already provided capital improvements to TOBAY that "exceeded its contractual obligation [under the *Concession Agreement*] by more than one hundred percent."  In particular, *Amendment I* explicitly recognized that, even though SRB had, pursuant to the terms of the *Concession Agreement*, only been obligated to make Two Million Ninety Seven Thousand Dollars ($2,097,000) in capital improvements, it had already, by the time *Amendment I* was signed, made total improvements having a value of Four Million Six Hundred Thousand Dollars ($4,6000,000).  In the face of these improvements, and the obvious economic benefit conferred on TOBAY, *Amendment I* exercised TOBAY's ten year term renewal as contained within the *Concession Agreement*.

19.     Subsequent to TOBAY and SRB's execution of *Amendment I*, SRB made further improvements to the Facilities totaling approximately Three Hundred Sixty Thousand Dollars ($360,000) and, in addition, expressed a desire and a willingness to make further improvements to the Facilities.

20.     Consequently, on or about September 16, 2008, TOBAY and SRB executed a further amendment to the *Concession Agreement*, a true and accurate copy of which is attached hereto as Exhibit C (*Amendment II*").

21.     Pursuant to *Amendment II*, SRB obligated itself to make an additional Three Million Two Hundred Fifty Thousand Dollars ($3,250,000) in improvements to the Facilities before December 31, 2011.   In return, and in recognition of the fact that these additional improvements would "greatly benefit" TOBAY's residents, TOBAY further extended the term of the *Concession Agreement* by an additional twenty (20) years, through December 31, 2049.

### *SRB's Need To Obtain Financing*

22.     Sometime during 2010, SRB determined that it would require financing to, *inter alia*, properly operate the Facilities and complete the improvements required by the terms of *Amendment II*.

23.     In furtherance of that quest for financing, SRB subsequently entered into negotiations with NDH Capital Corporation ("NDH").

24.     NDH was, in actuality, a loan broker for PHL, a fact that was fully disclosed to SRB from the inception of the negotiations.   As a loan broker, NDH would find loan opportunities for the account of PHL.   Consequently, and as SRB knew, while NDH would

-6-

initially be the party contracting with SRB, PHL was actually the entity providing the funding and, immediately subsequent to the closing of the subject loan by NDH, PHL would (and actually did) succeed to and be assigned all of NDH's rights thereto. Indeed, throughout the loan negotiation process, SRB regularly dealt with two different lawyers – one that represented NDH, and one that represented PHL.

25. One of the issues that made it difficult for SRB to obtain financing was the simple fact that it had no collateral to support any potential loan. In particular, SRB obviously did not own the Golf Course or the Facilities, and even the improvements that SRB intended to make to the Facilities would, once completed and accepted by TOBAY, become TOBAY's property.

26. In the absence of any such collateral, PHL was unwilling to commit to loan money to SRB.

27. Recognizing that TOBAY was itself benefitting from its relationship with SRB, and that it would also receive the economic benefit derived from the operation of the Facilities and construction of the improvements that SRB was, by virtue of the *Concession Agreement* (as amended), contractually required to make, SRB, NDH and PHL entered into negotiations with TOBAY to structure a transaction that would assure that PHL would receive significant monies from TOBAY in the event that SRB defaulted in its repayment obligations. These monies would, of course, then be utilized to satisfy the loan made to SRB.

28. In particular, and as more specifically described below, counsel for SRB, NDH, PHL and TOBAY collaboratively created a vehicle whereby, should SRB default on the

-7-

subject loan, the *Concession Agreement* would automatically be terminated and, in turn, TOBAY would be required to make a "Termination Payment" to PHL. This "Termination Payment" would, in effect, make PHL whole because it was specifically formulated to equal the amounts then outstanding under the loan made by PHL/NDH to SRB. Alternatively, if TOBAY for some reason terminated the *Concession Agreement* (other than as a consequence of SRB's default on the subject loan), TOBAY would then be obligated to pay PHL a "Cause Termination Payment" based on the agreed value of the improvements made by SRB.

29.     As a result of the successful conclusion of those negotiations, NDH/PHL agreed to provide financing to SRB in the amount of $7,843,138.08, inclusive of interest ("**Loan**").

30.     The Loan was evidenced by, among other things:

A.     A certain *Term Loan, Pledge and Security Agreement* by and between NDH and SRB dated November 18, 2011, a true and accurate copy of which is attached hereto as Exhibit D; and

B.     A certain *Negotiable Promissory Note* by and between NDH and SRB dated November 18, 2011 in the amount of $7,843,138.08 (inclusive on interest), a true and accurate copy of which is attached hereto as Exhibit E.

(The *Term Loan, Pledge and Security Agreement*, the *Negotiable Promissory Note*, and all other financing documents executed in connection therewith are hereinafter collectively referred to as the "***Loan Documents***").

31.     Additionally, contemporaneously with, and as part of the Loan transaction, SRB and TOBAY agreed to amend the *Concession Agreement*. That amendment was effectuated by

-8-

a certain *Amendment to Concession Agreement* dated as of November 18, 2011, a true and accurate copy of which is attached hereto as Exhibit F ("*Amendment III*").

32.     Pursuant to *Amendment III*, and as described above, TOBAY agreed with SRB that, in the event SRB defaulted on the Loan, the *Concession Agreement* would be deemed terminated without further notice, and TOBAY would remit a "Termination Payment" to PHL. The Termination Payment was defined by *Amendment III* to include, *inter alia*, all amounts "due or to become due under the Loan Documents."

33.     *Amendment III* further provided that, should TOBAY terminate the *Concession Agreement* for some reason other than SRB's default with respect to the Loan (and without regard to whether, in actuality, the Loan was in default), then, in such an event, TOBAY would remit to PHL a "Cause Termination Payment" equal to five percent (5%) of the capital improvements made by SRB to the Facilities for each "year[ ], or part of a year, remaining in the initial term of the [*Concession Agreement*], including any renewal options, but in no event to exceed 100% of the value of said improvements . . . ." Additionally, *Amendment III* provided as follows: "For purposes of calculation of the Cause Termination Payment . . . , [TOBAY] and [SRB] each confirms [*sic*] that the aggregate value of the capital improvements as of the date hereof are $10,000,000.00."

34.     Finally, *Amendment III* explicitly provided that TOBAY's obligation to remit the Termination Payment would:

> not be subject to any defenses, including but not limited to, the defenses of bankruptcy or insolvency of [SRB], set off, counterclaim or recoupment which [TOBAY] may have against

[SRB], for any reason whatsoever, including any circumstance whatsoever which might constitute a legal or equitable discharge or defense of [TOBAY].

## Count I – Breach of Contract For Failure to Remit the Termination Payment

35.    PHL incorporates the provisions of paragraphs 1 through 34 into this Count I, each as if fully set forth herein.

36.    SRB ultimately defaulted on its obligations to PHL and, on or about November 19, 2015, PHL provided notice to SRB and TOBAY of its election to accelerate the *Negotiable Promissory Note* and to declare the Loan immediately due and payable in full.  A copy of such notice is attached hereto as Exhibit G.

37.    Subsequently, by correspondence dated February 26, 2016, PHL undertook to provide further notice to TOBAY regarding SRB's default, as well as SRB's failure to timely cure the same ("***TOBAY Notice***").  In accordance with the provisions of the *Concession Agreement* (as amended), the *TOBAY Notice* demanded that TOBAY remit the Termination Payment to PHL within sixty (60) days of the date of such notice.  A copy of the *TOBAY Notice* is attached hereto as Exhibit H.

38.    TOBAY has, despite the demands set forth in the *TOBAY Notice*, failed and/or refused to remit the Termination Payment to PHL, all in violation of the terms of the *Concession Agreement* (as amended).

39.    As of June 1, 2016, the amounts due and outstanding under the *Loan Documents* are:

AM 57468927.1

| | |
|---|---|
| Principal Balance | $3,853,002.29 |
| Make-Whole Premium | $808,185.98 |
| Past Due Payments | $588,235.36 |
| Default Interest | $23,137.26 |
| Accrued interest | $12,006.06 |
| Accrued Fees and Costs | $836,056.87 |
| **Total Due** | $6,252,623.82 |

In addition, additional amounts will, pursuant to the *Loan Documents*, continue to accrue, and become payable, with the passage of time.

40.     PHL is an intended third-party beneficiary of the *Concession Agreement* (as amended).

41.     TOBAY's failure and refusal to pay the Termination Amounts constitutes a breach of the *Concession Agreement* (as amended), and PHL has been directly damaged as a consequence thereof.

**Count II – Breach of Contract For Failure to Remit the Cause Termination Payment**

42.     PHL incorporates the provisions of paragraphs 1 through 34 into this Count II, each as if fully set forth herein.

43.     Substantial improvements have been made to the Facilities, although PHL presently lacks sufficient knowledge to establish the precise dollar value thereof.

44.     TOBAY has, in fact, terminated the *Concession Agreement*, thus triggering, to the extent the Termination Payment is, for some reason, not properly payable by TOBAY, the provisions requiring payment of the Cause Termination Payment to PHL.

45.     TOBAY has failed to remit the Cause Termination Payment to PHL, all in violation of the terms of the *Concession Agreement* (as amended).

AM 57468927.1

46.     PHL is an intended third-party beneficiary of the *Concession Agreement* (as amended).

47.     TOBAY's failure and refusal to pay the Cause Termination Amounts constitutes a breach of the *Concession Agreement* (as amended), and PHL has been directly damaged as a consequence thereof.

### Count III – Unjust Enrichment

48.     PHL incorporates the provisions of paragraphs 1 through 34 into this Count III, each as if fully set forth herein.

49.     TOBAY was unjustly, unfairly and inequitably enriched to the extent PHL's funds were utilized to improve and/or operate the Facilities.

47.     That enrichment came at the expense and to the detriment of PHL.

48.     Both equity and good conscience dictate that TOBAY should reimburse PHL for any improvements to the Facilities made by SRB with PHL funds.

### Count IV – Innocent Misrepresentation (Based on the Actions of Harris Beach PLLC)

49.     PHL incorporates the provisions of paragraphs 1 through 34 into this Count IV, each as if fully set forth herein.

50.     In connection with documentation of the Loan, NDH and PHL conditioned their respective willingness to make and fund the Loan on the provisioning by TOBAY's counsel of a letter substantiating, *inter alia*, the validity and enforceability of TOBAY's obligations to make the Termination Payment or the Cause Termination Payment in accordance with the terms and provisions of *Amendment III*.

AM 57468927.1

51.     TOBAY was, in connection with the negotiation of the Loan, represented by Harris Beach, PLLC ("Harris Beach"), and by its own deputy town attorney, Frederick E. Mei ("Mei").

52.     In fulfillment of NDH/PHL's conditions as aforesaid, Harris Beach supplied NDH with its opinion letter dates November 16, 2011, a copy of which is attached hereto as Exhibit I ("*Harris Beach Letter*").

53.     The *Harris Beach Letter* specifically represented to NDH (and to NDH's "successors and assigns" which, as described above, includes PHL) that, *inter alia*:

> A.     TOBAY had "the power and authority to conduct the business described in the [*Concession Agreement* (as amended)];"

> B.     "The [*Concession Agreement* (as amended)] ha[s] been duly authorized by all necessary action of TOBAY and ha[s] been duly executed and delivered by TOBAY;" and

> C.     "The [*Concession Agreement* (as amended) is] the valid binding obligations of TOBAY, enforceable in accordance with [its] respective terms by NDH and its successors and assigns."

54.     By letter dated June 16, 2015, Leonard Genova, TOBAY's town attorney and the individual who actually executed *Amendment III*, notified NDH that, in TOBAY's view, the obligations imposed upon TOBAY by virtue of *Amendment III* were of no legal effect because *Amendment III* "purport[s] to make the Town a guarantor of the . . . [L]oan, which violates Article VIII, §1 of the New York State Constitution, and because [such amendment] was [not]

AM 57468927.1

authorized by a Town Board Resolution, as required under New York State Town Law § 64(6). A copy of such letter ("*Genova Letter*") is attached hereto as <u>Exhibit J</u>.

55.     To the extent TOBAY is correct with respect to the legal assertions contained within the *Genova Letter*, it necessarily follows that Harris Beach's representations, as contained in the *Harris Beach Letter*, were, and remain, untrue.

56.     In making the representations contained within the *Harris Beach Letter*, Harris Beach acted for the benefit, and on behalf of, TOBAY.

57.     NDH and PHL reasonably relied to their detriment on the representations made by TOBAY's agent, Harris Beach, and contained within the *Harris Beach Letter*.

58.     PHL has been damaged as a direct result of such misrepresentations in that it funded the Loan, and the same is presently uncollectable from SRB.

59.     As of June 1, 2016, the amounts due and outstanding under the *Loan Documents* are:

| | |
|---|---|
| Principal Balance | $3,853,002.29 |
| Make-Whole Premium | $808,185.98 |
| Past Due Payments | $588,235.36 |
| Default Interest | $23,137.26 |
| Accrued interest | $12,006.06 |
| Accrued Fees and Costs | $836,056.87 |
| **Total Due** | $6,252,623.82 |

In addition, additional amounts will, pursuant to the *Loan Documents*, continue to accrue, and become payable, with the passage of time, and such amounts are likewise properly recoverable from TOBAY.

-14-

<u>**Count V – Innocent Misrepresentation (Based on the Actions of Mei)**</u>

60.     PHL incorporates the provisions of paragraphs 49 through 51 into this Count V, each as if fully set forth herein.

61.     In fulfillment of NDH/PHL's conditions as aforesaid, Mei supplied NDH with his opinion letter dates November 18, 2011, a copy of which is attached hereto as <u>Exhibit K</u> ("***Mei Letter***").

62.      The *Mei Letter*, which was written on TOBAY letterhead by Mei "in [his] capacity as deputy town attorney," specifically represented to NDH (and to NDH's "successors and assigns" which, as described above, includes PHL) that, *inter alia*:

> A.     TOBAY had "the power and authority to conduct the business described in the [*Concession Agreement* (as amended)];"
>
> B.     "The [*Concession Agreement* (as amended)] ha[s] been duly authorized by all necessary action of TOBAY and ha[s] been duly executed and delivered by TOBAY;"
>
> C.     "The [*Concession Agreement* (as amended) is] the valid binding obligations of TOBAY, enforceable in accordance with [its] respective terms by NDH and its successors and assigns;" and
>
> D.     "The payments to be made by TOBAY under the [*Concession Agreement* (as amended)] are not subject to any conditions precedent to funding and are not subject to any off-sets, reductions or defenses to satisfy TOBAY's obligations."

63.     By letter dated June 16, 2015, Leonard Genova, TOBAY's town attorney and the individual who actually executed *Amendment III*, notified NDH that, in TOBAY's view, the

AM 57468927.1

obligations imposed upon TOBAY by virtue of *Amendment III* were of no legal effect because *Amendment III* "purport[s] to make the Town a guarantor of the . . . [L]oan, which violates Article VIII, §1 of the New York State Constitution, and because [such amendment] was [not] authorized by a Town Board Resolution, as required under New York State Town Law § 64(6). A copy of such letter ("***Genova Letter***") is attached hereto as <u>Exhibit J</u>.

64.     To the extent TOBAY is correct with respect to the legal assertions contained within the *Genova Letter*, it necessarily follows that Mei's representations, as contained in the *Mei Letter*, were, and remain, untrue.

65.     In making the representations contained within the *Mei Letter*, Mei acted for the benefit, and on behalf of, TOBAY.

66.     NDH and PHL reasonably relied to their detriment on the representations made by TOBAY's agent, Mei, and contained within the *Mei Letter*.

67.     PHL has been damaged as a direct result of such misrepresentations in that it funded the Loan, and the same is presently uncollectable from SRB.

68.     As of June 1, 2016, the amounts due and outstanding under the *Loan Documents* are:

| | |
|---|---|
| Principal Balance | $3,853,002.29 |
| Make-Whole Premium | $808,185.98 |
| Past Due Payments | $588,235.36 |
| Default Interest | $23,137.26 |
| Accrued interest | $12,006.06 |
| Accrued Fees and Costs | $836,056.87 |
| **Total Due** | $6,252,623.82 |

In addition, additional amounts will, pursuant to the *Loan Documents*, continue to accrue, and become payable, with the passage of time, and such amounts are likewise properly recoverable from TOBAY.

## Count VI – Negligent Misrepresentation (Based on the Actions of Harris Beach)

69.     PHL incorporates the provisions of paragraphs 1 through 55 into this Count VI, each as if fully set forth herein.

70.     Harris Beach (and thus, TOBAY) knew or should have known that the representations contained in the *Harris Beach Letter* were untrue.

71.     In making the representations contained within the *Harris Beach Letter*, Harris Beach acted for the benefit, and on behalf of, TOBAY.

72.     NDH and PHL reasonably relied to its detriment on the representations made by TOBAY's agent, Harris Beach, and contained within the *Harris Beach Letter*.

73.     PHL has been damaged as a direct result of such misrepresentations in that it funded the Loan, and the same is presently uncollectable from SRB.

74.     As of June 1, 2016, the amounts due and outstanding under the *Loan Documents* are:

| | |
|---|---|
| Principal Balance | $3,853,002.29 |
| Make-Whole Premium | $808,185.98 |
| Past Due Payments | $588,235.36 |
| Default Interest | $23,137.26 |
| Accrued interest | $12,006.06 |
| Accrued Fees and Costs | $836,056.87 |
| **Total Due** | $6,252,623.82 |

-17-

In addition, additional amounts will, pursuant to the *Loan Documents*, continue to accrue, and become payable, with the passage of time, and such amounts are likewise properly recoverable from TOBAY.

### Count VII – Negligent Misrepresentation (Based on the Actions of Mei)

75.     PHL incorporates the provisions of paragraphs 60 through 64 into this Count VII, each as if fully set forth herein.

76.     Mei (and thus, TOBAY) knew or should have known that the representations contained in the *Mei Letter* were untrue.

77.     In making the representations contained within the *Mei Letter*, Mei acted for the benefit, and on behalf of, TOBAY.

78.     NDH and PHL reasonably relied to their detriment on the representations made by TOBAY's agent, Mei, and contained within the *Mei Letter*.

79.     PHL has been damaged as a direct result of such misrepresentations in that it funded the Loan, and the same is presently uncollectable from SRB.

80.     As of June 1, 2016, the amounts due and outstanding under the *Loan Documents* are:

| | |
|---|---|
| Principal Balance | $3,853,002.29 |
| Make-Whole Premium | $808,185.98 |
| Past Due Payments | $588,235.36 |
| Default Interest | $23,137.26 |
| Accrued interest | $12,006.06 |
| Accrued Fees and Costs | $836,056.87 |
| **Total Due** | $6,252,623.82 |

AM 57468927.1

In addition, additional amounts will, pursuant to the *Loan Documents*, continue to accrue, and become payable, with the passage of time, and such amounts are likewise properly recoverable from TOBAY.

### Count VIII – Fraud (Based on the Actions of Harris Beach)

81.    PHL incorporates the provisions of paragraphs 1 through 55 into this Count VIII, each as if fully set forth herein.

82.    In stating that the *Concession Agreement* was "duly authorized by all necessary action of TOBAY and ha[s] been duly executed and delivered by TOBAY," and in further stating that the *Concession Agreement* was "enforceable in accordance with [its] . . . terms," Harris Beach acted in reckless disregard of the truth.

83.    In making such statements, Harris Beach acted for the benefit and on behalf of TOBAY.

84.    To the extent the assertions contained within the *Genova Letter* are true, Harris Beach (and thus TOBAY) was distinctly situated to know the true state of such facts, and any contrary assertions contained in the *Harris Beach Letter* would have been objectively groundless, unreasonable and false.  In sum, the *Harris Beach Letter* stated facts that were claimed to be known as true by Harris Beach (and thus TOBAY) when, in point of fact, Harris Beach had no reasonable basis for so stating.

85.    Harris Beach knew that NDH/PHL would rely upon the assertions contained within the *Harris Beach Letter* and it made such statements with the full intention that NDH/PHL so rely.

86.     NDH and PHL reasonably relied to their detriment on the representations made by TOBAY's agent, Harris Beach, and contained within the *Harris Beach Letter*.

87.     PHL has been damaged as a direct result of such misrepresentations in that it funded the Loan, and the same is presently uncollectable from SRB.

88.     As of June 1, 2016, the amounts due and outstanding under the *Loan Documents* are:

| | |
|---|---|
| Principal Balance | $3,853,002.29 |
| Make-Whole Premium | $808,185.98 |
| Past Due Payments | $588,235.36 |
| Default Interest | $23,137.26 |
| Accrued interest | $12,006.06 |
| Accrued Fees and Costs | $836,056.87 |
| **Total Due** | $6,252,623.82 |

In addition, additional amounts will, pursuant to the *Loan Documents*, continue to accrue, and become payable, with the passage of time, and such amounts are likewise properly recoverable from TOBAY.

## Count IX – Fraud (Based on the Actions of Mei)

89.     PHL incorporates the provisions of paragraphs 60 through 64 into this Count IX, each as if fully set forth herein.

90.     In stating that the *Concession Agreement* was "duly authorized by all necessary action of TOBAY and ha[s] been duly executed and delivered by TOBAY," and that the *Concession Agreement* was "enforceable in accordance with [its] . . . terms," Mei acted in reckless disregard of the truth.

91.     In making such statements, Mei acted for the benefit and on behalf of TOBAY.

-20-

92.     To the extent the assertions contained within the *Genova Letter* are true, Mei (and thus TOBAY) was distinctly situated to know the true state of such facts, and any contrary assertions contained in the *Mei Letter* would have been objectively groundless, unreasonable and false.  In sum, the *Mei Letter* stated facts that were claimed to be known as true by Mei (and thus TOBAY) when, in point of fact, Mei had no reasonable basis for so stating.

93.     Mei knew that NDH/PHL would rely upon the assertions contained within the *Mei Letter* and he made such statements with the full intention that NDH/PHL so rely.

94.     NDH and PHL reasonably relied to their detriment on the representations made by TOBAY's agent, Mei, and contained within the *Mei Letter*.

95.     PHL has been damaged as a direct result of such misrepresentations in that it funded the Loan, and the same is presently uncollectable from SRB.

96.     As of June 1, 2016, the amounts due and outstanding under the *Loan Documents* are:

| | |
|---|---|
| Principal Balance | $3,853,002.29 |
| Make-Whole Premium | $808,185.98 |
| Past Due Payments | $588,235.36 |
| Default Interest | $23,137.26 |
| Accrued interest | $12,006.06 |
| Accrued Fees and Costs | $836,056.87 |
| **Total Due** | $6,252,623.82 |

In addition, additional amounts will, pursuant to the *Loan Documents*, continue to accrue, and become payable, with the passage of time, and such amounts are likewise properly recoverable from TOBAY.

AM 57468927.1

WHEREFORE, and based upon the foregoing, PHL prays that this Court enter the following relief:

A.      An award of money damages with respect to the Termination Payment, in such amount as the proofs at trial show is properly due;

B.      Alternatively, an award of money damages with respect to the Cause Termination Payment, in such amount as the proofs at trial show is properly due;

C.      Alternatively, an award of money damages with respect to TOBAY's unjust enrichment at the expense of PHL, in such amount as the proofs at trial show is properly due;

D.      Alternatively, an award of money damages against TOBAY as a consequence of its misrepresentations, in such amount as the proofs at trial show is properly due;

E.      Pre-judgment interest;

F.      Post-judgment interest;

G.      Costs; and

H.      Such other and further relief as this court deems just and proper.

PHL Variable Insurance Company


By:    /s/ Donald E. Frechette
          Donald E. Frechette
          Tara L. Trifon
          Locke Lord LLP
          20 Church Street, 20th Floor
          Hartford, CT 06103
          Phone: (860) 525-5065
          Fax: (860) 527-4198
          Email: donald.frechette@lockelord.com

-22-