UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
PHL VARIABLE INSURANCE COMPANY,

                              Plaintiff,

              -against-                                          16-CV-4013 (SJF)(AKT)

TOWN OF OYSTER BAY,                                     **OPINION and ORDER**

                              Defendant.
-----------------------------------------------------------------------X
FEUERSTEIN, District Judge:

On or about July 19, 2016, plaintiff PHL Variable Insurance Company ("plaintiff" or

"PHL"), commenced this action against defendant Town of Oyster Bay ("defendant" or "the

Town") pursuant to this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332,

asserting claims seeking damages for breach of contract, unjust enrichment, innocent

misrepresentation, negligent misrepresentation and fraud.  On July 27, 2016, plaintiff filed an

amended complaint, *inter alia*, asserting additional claims against defendant seeking damages for

innocent misrepresentation, negligent misrepresentation and fraud.  Pending before the Court is

defendant's motion to dismiss plaintiff's claims against it in the amended complaint pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.  For

the reasons set forth below, defendant's motion is granted to the extent set forth herein.


I.        BACKGROUND

          A.        Factual Background[1]

_____

[1]  The factual allegations in the amended complaint are assumed to be true for purposes of this
motion, "unless contradicted by more specific allegations or documentary evidence," *L-7*

Defendant is a town located within the County of Nassau, in the State of New York, that owns and operates, *inter alia*, a municipal golf course (the "Golf Course"). (Amended Complaint ["Am. Compl."], ¶¶ 5, 8). There are several dining and concession facilities at the Golf Course ("the Facilities"), including: (1) a restaurant, catering and banquet facility commonly known as "The Woodlands at Woodbury;" (2) a snack bar called "The Halfway House," located on the eighth (8th) tee; and (3) other concessions "sited at the driving range." (*Id.*, ¶ 9).

On or about October 30, 2000, defendant entered into a license agreement ("the Concession Agreement") with SRB Catering Corp., d/b/a H.R. Singleton's Classic American Grille ("SRB Catering"), (Am. Compl., ¶ 11), in order "to secure the efficient and beneficial operation of a food and beverage service at the . . . Golf Course, and to provide major capital improvements to the Club House." (*Id.*, Ex. A at 1). Specifically, pursuant to the Concession Agreement, *inter alia*, SRB Catering agreed "to maintain and operate a food and beverage service at the Club House, the Halfway House, and the Driving Range, on the . . . Golf Course," (*id.*, Ex. A, ¶ 2); and "to make capital improvements to the facility, with a total value of approximately $2,097,000.00," pursuant to plans, specifications and a schedule approved by the Town, within the first three (3) years of the Concession Agreement. (*Id.*, ¶ 39). The Concession Agreement further provides, *inter alia*, that "[t]itle to all [capital] improvements shall vest in the [Town] upon completion and acceptance of the work." (*Id.*, ¶ 39(g)).

The term of the Concession Agreement was for a period of twenty (20) years, beginning

---

*Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011), and do not constitute findings of fact by the Court.

January 1, 2001, and ending on December 31, 2020, (Am. Compl., ¶ 37), but it could be renewed for a period of ten (10) years "[a]t the sole option of the [Town]." (*Id.*) Pursuant to paragraph thirty-seven (37) of the Concession Agreement, SRB Catering was required to pay the Town a license fee of forty-eight thousand dollars ($48,000.00), in equal monthly payments of four thousand dollars ($4,000.00) per month, for the period from January 1, 2001 through December 31, 2001. (*Id.*) For each subsequent year, the annual license fee was increased by three percent (3%) from the previous year. (*Id.*) However, the Concession Agreement also gave the Town, at its sole option, "the right to convert th[e] [annual license] payment provision to require [SRB Catering] to pay [it] a percentage of annual gross receipts." (*Id.*) In the event that the Town exercised that option, SRB Catering was required to pay it a yearly license fee equal to (i) five percent (5%) of annual gross receipts; or (ii) six percent (6%) of annual gross sales if the annual gross sales of SRB Catering exceeded two million dollars ($2,000,000.00). (*Id.*) Except as provided in Paragraph 37 of the Concession Agreement, all income derived from the operation of the Concession Agreement belonged to SRB Catering. (*Id.*, ¶ 9). The Concession Agreement was executed by Harendra Singh ("Singh"), as "V.P.," presumably vice president, of SRB Catering, and the then-Town Supervisor, John Venditto ("Venditto"), on behalf of the Town, (*id.* at 24-25), pursuant to Town Resolution No. 638-2000, which was adopted on October 3, 2000. (*See* Am. Compl., Ex. C at 1, Ex. D at 5 and Ex. F at 1).

On or about April 19, 2005, the Town entered into a license agreement (the "First Amended Concession Agreement" or "FACA") with "SRB Convention and Catering Corp., d/b/a

The Woodlands and PassionFish" ("SRB Convention")[2], (Am. Compl., Ex. B at 1), in order "to secure the efficient and beneficial operation of a food and beverage concession service at the . . . Golf Course, to accept the major capital improvements heretofore performed by [SRB] to the Club House, and to provide for future improvements[.]" (*Id.*)  Pursuant to the FACA, *inter alia*, SRB Convention agreed "to maintain and operate a food and beverage concession service at the Club House, the Breakfast House and the Halfway House, and the Driving Range if so requested, on the . . . Golf Course." (*Id.*, Ex. B, ¶ 2).

Paragraph 32 of the FACA, under the heading, "Termination of Agreement," provides:

*"The [Town] has the right to terminate this [FACA] if:*

> a) [SRB Convention] does not fulfill its obligations, or any part thereof, with diligence to insure proper services within the term of this [FACA], including any authorized extension.

> b) [SRB Convention] does not comply with all laws, ordinances, rules, or provisions governing this [FACA] or is otherwise in violation of any provision of this [FACA].

> c) [SRB Convention] is in violation of any law, rule, regulation or judicial order applicable to the operation of this [FACA] by [SRB Convention].

> d) This [FACA], or any part of it, is subcontracted without first obtaining the consent of the [Town], which consent shall not be unreasonably

---

[2]  Neither party explains the relationship between SRB Convention and SRB Catering, or even seemingly recognizes that the entity that entered into the Concession Agreement had different corporate and "doing business as" names than the entity that entered into the subsequent agreements relating to the Concession Agreement.  Instead, both parties merely refer to "SRB," as if the two (2) corporate entities are one and the same.  That the two (2) entities were not, in fact, the same is also evidenced by the fact that Singh executed the Concession Agreement in his capacity as "V.P.," presumably vice president, of SRB Catering, but executed all subsequent agreements relating to the Concession Agreement in his capacity as president of SRB Convention.  Nonetheless, where it is unclear whether a reference in the pleadings, or documents attached thereto, relates to either SRB Catering or SRB Convention, the Court, like the parties, will cite merely to "SRB."

withheld, provided the subcontract is consistent with the purposes of this [FACA].

e) This [FACA], or any claim under it, is assigned by [SRB Convention] in a way not specified in this [FACA].

f) [SRB Convention] is in default of any of the material terms and conditions of this [FACA].

g) [SRB Convention] does not timely make the monthly concession payments.

Upon the occurrence of any of the abovementioned events, the [Town], without prejudice or waiver of any of its rights or interests under this [FACA], shall give [SRB Convention] written notice of such default, *and [SRB Convention] shall have sixty (60) days after the receipt of said notice to cure such default.* If, after said period, [SRB Convention] has failed to cure or has not diligently commenced to cure such default, the [Town] has the right to declare [SRB Convention] in default of this [FACA], to terminate this [FACA], and to assume possession and control of all materials, equipment and operations under this [FACA]. The [Town] may thereupon undertake all appropriate measures for the completion of this [FACA].

*In the event the [Town] terminates this [FACA] for any reason other than the default of [SRB Convention], the [Town] shall pay to [SRB Convention] a sum equal to 4% of the capital improvements made to the facility by [SRB Convention], for each year or part of a year remaining in this [FACA], up to 100% of the value of said improvements. In addition, the [Town] will pay [SRB Convention] for lost profits on catering events which were booked prior to a termination for any reason other than the default of [SRB Convention], subject to an offset for deposits being held by [SRB Convention] for said events.*

[SRB Convention] shall notify the [Town] of the name, address and telephone number of each financing entity. The [Town] shall notify each financing entity, of which the [Town] has notice, of the occurrence of any of the events listed in the herein Paragraph. Such financing entity shall have the right to cure any default, consistent with the provisions contained in the herein Paragraph. In the event of a default of [SRB Convention], the financing entity shall be entitled to receive any payments then due to [SRB Convention] by the [Town]."

(Am. Compl., Ex. B, ¶ 32) (italicized language was subsequently amended as set forth below).

Paragraph 37 of the FACA provides, in pertinent part:

> "The term of the original [Concession Agreement] was for a period of twenty years, beginning January 1, 2001, and ending on December 31, 2020. The original [Concession Agreement] provided for a ten-year renewal, at the option of the [Town]. In light of the financial obligations entered into by [SRB] in performing the capital improvements, which exceeded its contractual obligation by more than one hundred percent, the [Town] hereby exercises the renewal. Accordingly, this [FACA] shall be effective through December 31, 2029."

(Am. Compl., Ex. B, ¶ 37). The payment provisions in the FACA remained the same as in the original Concession Agreement.

Paragraph 39 of the FACA provides, in pertinent part:

> "a)    In the original [Concession Agreement], [SRB] agreed to make capital improvements to the facility, with a total value of approximately $2,097,000.00. [SRB] has presented paid invoices to the [Town] indicating that the project cost to date is $4,462,715.00. The [Town] had an independent firm review the invoices, and perform a visual inspection of the work performed. Based upon said review, a value of $4,600,000.00 was established for the work. The [Town] hereby accepts the capital improvements to the Golf Course Club House.
>
> b)    [SRB] may make additional capital improvements to the facility, at its own cost and expense, with no setoff from the concession payment to the [Town], however all such capital improvements must be approved by the [Town].
>
> . . .
>
> d)    Title to all capital improvements shall vest in the [Town] upon completion and acceptance of the work. . . ."

(Am. Compl., Ex. B, ¶ 39). The FACA was executed by Singh, as President of SRB Convention, and Venditto, on behalf of the Town, (*id.* at 22-23), pursuant to Town Resolution No. 313-2005, which was adopted on April 19, 2005. (*See Id.*, Ex. C at 1, Ex. D at 5 and Ex. F at 1).

On September 16, 2008, the Town and SRB Convention entered into an agreement ("the Extension Agreement"), indicating, *inter alia*, that

> "since 2005, [SRB Convention] has made additional capital improvements of up to $359,167.11, and has now proposed to make an additional $3,250,000.00 in capital improvements, to the [Golf Course Facilities], within the next three years, which improvements would enhance the [Golf Course], and would greatly benefit the residents of the [Town]; and . . . in light of the financial obligations [SRB Convention] would incur in performing the capital improvements, [SRB Convention] has requested that the abovementioned agreement be extended[.]"

(Am. Compl., Ex. C at 1-2). Pursuant to the Extension Agreement, SRB Convention agreed "to make an additional $3,250,000,00 in capital improvements to the [Golf Course Facilities]," to be completed by December 31, 2011; and the Town extended the FACA through December 31, 2049, in consideration of the additional capital improvements to be made by SRB Convention. (*Id.* at 2). The Extension Agreement was executed by Singh, as president of SRB Convention, and Venditto, (*id.* at 2-3), pursuant to Town Resolution No. 889-2008, which was adopted on September 16, 2008. (*See Id.*, Ex. D at 5 and Ex. F at 1).

According to plaintiff, "[s]ometime during 2010, SRB determined that it would require financing to, *inter alia*, properly operate the Facilities and complete the improvements required by the terms of [the Extension Agreement]." (Am. Compl., ¶ 22). SRB Convention subsequently entered into negotiations with NDH Capital Corporation ("NDH"), a loan broker for plaintiff, (*Id.*, ¶¶ 23-24); however, "[o]ne of the issues that made it difficult for SRB to obtain financing was the simple fact that it had no collateral to support any potential loan." (*Id.*, ¶ 25). According to plaintiff, "[i]n the absence of any such collateral, [it] was unwilling to commit to loan money to SRB," (*Id.*, ¶ 26), so "SRB, NDH and [plaintiff] entered into negotiations with [defendant] to structure a transaction that would assure that [plaintiff] would receive significant monies from [defendant] *in the event that SRB defaulted in its repayment obligations*[,] . . . [which] would . . . be utilized to satisfy the loan made to SRB." (*Id.*, ¶ 27) (emphasis added). Specifically, "counsel

for SRB, NDH, [plaintiff] and [defendant] collaboratively created a vehicle whereby, should

SRB default on the subject loan, the Concession Agreement would automatically be terminated

and, in turn, [defendant] would be required to make a 'Termination Payment' to [plaintiff]." (*Id.*,

¶ 28) (italics omitted).  Plaintiff alleges that the "'Termination Payment' would, in effect, make

[it] whole because it was specifically formulated to equal the amounts then outstanding under the

loan made by PHL/NDH to SRB." (*Id.*)  Plaintiff further alleges that, "[a]lternatively, if

[defendant] for some reason terminated the Concession Agreement (other than as a consequence

of SRB's default on the subject loan), [defendant] would then be obligated to pay [plaintiff] a

'Cause Termination Payment' based on the agreed value of the improvements made by SRB."

(*Id.*) (italics omitted).

According to plaintiff, "[a]s a result of the successful conclusion of those negotiations,

NDH/PHL agreed to provide financing to SRB in the amount of $7,843,138.08, inclusive of

interest ('Loan')."  (Am. Compl., ¶ 29) (emphasis omitted).  The Loan was evidenced by a "Term

Loan, Pledge and Security Agreement" by and between NDH and SRB Convention, dated

November 18, 2011 ("the Security Agreement"), (*id.*, Ex. D); and a "Negotiable Promissory

Note" by and between NDH and SRB Convention, also dated November 18, 2011 ("the Note")

(collectively, the "2011 Loan Documents").  (*Id.*, Ex. E).

On that same date, *i.e.*, November 18, 2011, the Town and SRB Convention ostensibly

entered into an "Amendment to Concession Agreement" (the "Second Amended Concession

Agreement" or "SACA"), pursuant to which the Town "agreed to amend the [FACA] to provide

for payment of certain amounts under the [FACA] to [plaintiff] *should [SRB Convention] default

in its obligations to [plaintiff]*," in order to induce plaintiff to provide the financing SRB

Convention was seeking "to facilitate the completion of the capital improvements" at the Golf Course, "and in consideration of the benefits the [Town] has and will continue to receive from the previous and proposed capital improvements[.]" (Am. Compl., Ex. F at 2) (emphasis added).

The SACA amended paragraph thirty-two (32) of the FACA, set forth above, by, *inter alia*, (1) renaming the heading from "Termination of Agreement" to "Events of Default;" (2) replacing the lead-in paragraph, italicized above, with the statement, "Any of the following events shall constitute an Event of Default under this Agreement[;]" and (3) adding the following subparagraph (h) as an "Event of Default:"

> "h) The receipt by the Town on written notice (a 'Loan Default Notice') from the Lender [defined therein as NDH and its successors or assigns, *i.e.*, plaintiff] of the occurrence of a default or event of default, beyond any applicable period for grace and cure, under (A) that certain Promissory Note dated as of October 27, 2011 [sic] in the face amount of $7,843,138.08 inclusive of interest as set forth therein . . . executed and delivered by [SRB Convention] to NDH . . . and/or (B) that certain Term Loan, Pledge and Security Agreement dated as of October 27, 2011 [sic] between [SRB Convention] and NDH . . . (a 'Loan Default'). With respect to any Loan Default under this subparagraph (h) of this Section 32 of this [SACA], [SRB Convention's] period of grace and cure shall be controlled by the Loan Documents, and the 60 day period set forth in the full paragraph following this subparagraph (h) [italicized above] shall not apply."

(Am. Compl., Ex. F at 2-3) (emphasis omitted). In addition, the SACA deleted the second to last paragraph of Paragraph 32 of the FACA, italicized above, and replaced it with the following:

> "Effective as of the date hereof, and for so long as [SRB Convention] shall owe any obligation to [NDH or plaintiff] . . . under the Loan Documents, the [Town] shall make all amounts payable by the Town under this Section 32 (the 'Termination Payment' as hereinafter defined) to NDH [or plaintiff] . . . . Notwithstanding anything to the contrary contained in this [SACA], and irrespective of any amounts paid by [SRB Convention] to the [Town], the status of the capital improvements or any event of default hereunder, the parties hereto agrees [sic] as follows:
>
> i) Upon the occurrence of an Event of Default under subsection (h) of this

Section 32 and the expiration of any applicable grace or cure periods, [SRB Convention] expressly acknowledges and agrees that the [FACA, as amended by the SACA] shall be deemed terminated by the Town without further notice to [SRB Convention]. [SRB Convention] hereby irrevocably authorizes and instructs the [Town] to pay the Termination Payment to [NDH or plaintiff], in one lump sum, within sixty (60) days following receipt of notice by [NDH or plaintiff] to the [Town] of such Event of Default and the expiration of any applicable cure periods. The Termination Payment shall equal the sum of (a) the Prepayment Amount set forth in the [Security] Agreement together with (b) all other amounts due and to become due under the [2011] Loan Documents, including, but not limited to any and all late interest, fees, costs, expenses and attorney's fees which may have accrued from the date of such default through the date of payment (the 'Default Amount'). The obligation of the [Town] to make the Termination Payment shall not be subject to any conditions precedent . . . [or] any defenses, including but not limited to, the defense of bankruptcy or insolvency of [SRB Convention], set off, counterclaim or recoupment which the [Town] may have against [SRB Convention], for any reason whatsoever, including any circumstance whatsoever which might constitute a legal or equitable discharge or defense of the [Town].

ii) In the event the [Town] terminates this [FACA, as amended by the SACA] prior to December 31, 2025 whether resulting from an event of default as set forth in subsection (a) through (g) of this Section 32 by [SRB Convention] or otherwise, (beyond the expiration of applicable grace and cure periods), [SRB Convention] hereby irrevocably authorizes and instructs the [Town] to pay the Termination Payment due under this [SACA] to [NDH or plaintiff] *to satisfy in full all of [SRB Convention's] obligations to [NDH or plaintiff]*. The [Town] shall make the payments to [NDH or plaintiff] within sixty (60) days of the date of such termination. Said termination payment shall be calculated by multiplying (A) 5% of the total capital improvements made to the [Golf Course Facilities] by [SRB Convention] calculated as of the date of termination, by (B) the number of years, or part of a year, remaining in the initial term of this [FACA, as amended by the SACA], including any remaining renewal options, but in no event to exceed 100% of the value of said improvements (the 'Cause Termination Payment').

(iii) 'Termination Payment' shall mean collectively, the Cause Termination Payment and the Default Amount . . . . Further, upon payment in full of the Termination Payment by the Town in accordance with the terms of this Section 32, (I) the Town will have purchased all right, title and interest of [SRB Convention] in and to the capital

> improvements made by [SRB Convention] to the [Golf Course Facilities] and all machinery, equipment, furniture, fixtures, materials and other property of [SRB Convention] located at or used in the connection with the operation of the [Golf Course Facilities] (the 'Purchased Property'), and (II) any and all security, interests, liens or encumbrances in the Purchased Property in favor of [NDH or plaintiff], if any, shall be released, satisfied and/or terminated by [NDH or plaintiff]. . . ."

(*Id.* at 3-5) (emphasis omitted; italics added).

In addition, the SACA provides, in pertinent part, as follows:

> "[] [SRB Convention] has assigned all of its rights to payment by the [Town] under the [FACA] as amended by this [SACA] to [NDH or plaintiff] pursuant to an Assignment of Concession Agreement Proceeds dated as of November 18, 2011 (the 'Assignment'). The [Town] acknowledges [NDH's or plaintiff's] rights under the Assignment and [NDH's or plaintiff's] security interest under the payments due under the [FACA, as amended by the SACA] and irrevocably agrees to pay the Payment Amounts (as such term is defined in the Assignment) in accordance with the instructions set forth in Exhibit A to the Assignment (or such other instructions as [NDH or plaintiff] may provide to the [Town] from time to time).

> [] For purposes of calculation of the Cause Termination Payment pursuant to Section 32(ii) of the [SACA], . . . the [Town] and [SRB Convention] each confirms that the aggregate value of the capital improvements as of the date hereof are $10,000,000.00 . . . .

> . . .

> [] Except as set forth in this Amendment, the parties hereby agree that all remaining terms of the [FACA] shall remain in full force and effect."

(Am. Compl., Ex. F, ¶¶ 4, 5 and 9).

Singh, as president of SRB Convention, signed the SACA on behalf of SRB Convention. However, unlike the Concession Agreement, the FACA and the Extension Agreement, which had all been executed by Venditto, as the then-Town Supervisor, pursuant to a resolution adopted by the Town Board, the SACA was executed by Leonard Genova ("Genova"), as the Town

Attorney; it was not executed by the Town Supervisor, (Am. Compl. at 7-8; *see id.*, ¶ 31), nor is there any indication in the pleadings, or in any of the documents attached thereto, that it was ever ratified by the Town Board.

Plaintiff alleges that "[i]n connection with documentation of the Loan, NDH and PHL conditioned their respective willingness to make and fund the Loan on the provisioning by [the Town's] counsel of a letter substantiating, *inter alia*, the validity and enforceability of [the Town's] obligations to make the Termination Payment or the Cause Termination Payment in accordance with the terms and provisions of [the SACA][,]" (Am. Compl., ¶ 35 at p. 13[3]); and that the Town was represented by Harris Beach, PLLC ("Harris Beach") and its own deputy town attorney, Frederick E. Mei ("Mei"), in connection with the negotiation of the Loan. (*Id.*, ¶ 36 at p. 13). By letter to NDH dated November 16, 2011 ("the Harris Beach Letter"), William J. Garry, Esq. ("Garry"), on behalf of Harris Beach, indicated, in relevant part, that in his opinion:

> "1.   [The Town] . . . has the power and authority to conduct the business described in the [Town] Documents [identified therein as "the representations and warranties contained in" the Concession Agreement, as amended; the Assignment; Town Resolution No. 638-2000, dated October 3, 2000; Town Resolution No. 313-2005, dated April 19, 2005; Town Resolution No. 889-2008, dated September 16, 2008; Town Resolution No. 605-2010, dated June 8, 2010[4]; "and other documents or certificates executed or delivered in connection therewith").

---

[3]  After paragraph forty (40) on page eleven (11) of the amended complaint, the paragraph numbers erroneously repeat for each cause of action. Accordingly, the misnumbered paragraphs are cited according to their paragraph number, page number and, when necessary, the "Count" number.

[4]  There is no indication in the pleadings or papers submitted in support of, or in opposition to, defendant's motion to dismiss as to the subject of Resolution No. 605-2010, which was adopted on June 8, 2010, *i.e.*, approximately seventeen (17) months before plaintiff made the loan to SRB Convention and the SACA was executed by SRB Convention and Genova.

2. [The Town] Documents have been duly authorized by all necessary action of [the Town] and have been duly executed and delivered by [the Town].

3. [The Town] Documents are the valid binding obligations of [the Town], enforceable in accordance with their respective terms by NDH and its successors and assigns.

. . .

6. The Assignment of Concession Proceeds creates in favor of NDH and its assigns, a legal, valid, first-priority security interest in the payments due to Improvements to the Facility made by [SRB Convention] under the [Concession] Agreement [as amended]. [The Town's] payment provisions as set forth under the [Concession] Agreement [as amended] are not subject to any conditions precedent to funding and are not subject to any off-sets, reductions or defenses to satisfy [the Town's] obligations.

These opinions are limited to the extent enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar laws of general applicability relating to or affecting the enforcement of creditors [sic] rights and by the effect of general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

These opinions are provided solely for NDH . . . and may only be relied upon by its successors and assigns. I am under no obligation to update this opinion letter after the date hereof."

(Am. Compl., Ex. I).

By letter to NDH that same date ("the Mei Letter"), Mei provided opinions virtually identical to Garry's opinions in the Harris Beach Letter. (Am. Compl., Ex. K).

On or about June 16, 2015, Thomas M. Sabellico, Esq., as special counsel to Genova, the then-Town Attorney, sent NDH a letter ("the Genova Letter") indicating, in pertinent part:

"This letter serves as notice that the November 2011 [SACA] is null and void . . . [and] that the November 2011 Purported Assignment is null and void insofar as it purports to impose duties on the Town.

The November 2011 [SACA] and . . . Purported Assignment are null and void because, among other reasons, they each purport to make the Town a guarantor of

> [SRB Convention's] loan, which violates Article VIII, § 1 of the New York State Constitution, and neither was authorized by a Town Board resolution, as required under New York State Town Law § 64(6)."

(Am. Compl., Ex. J).

"SRB ultimately defaulted on its obligations to [plaintiff]. . . ."  (Am. Compl., ¶ 35).  On or about November 19, 2015, plaintiff sent SRB Convention a "Third Notice of Acceleration,"[5] indicating, in relevant part:

> "Neither SRB Concession nor SRB Convention has made all the payments, including but not limited to attorneys' fees, due and payable pursuant to the Loan Documents and the Prior Notices of Acceleration [sent on or about August 5, 2015 and October 7, 2015].
>
> . . .
>
> . . . SRB Convention [also] failed to make the payment required under the [2011] Loan Documents within five business days of October 18, 2015.  Therefore, it is in default of the [2011] Loan Documents.
>
> Each of these failures constitutes a separate Event of Default under the Loan Documents.  (See, e.g. . . . November 8, 2011 [Security] Agreement at Paragraph 9[[6]]; Letter Amendment to the [2011] Loan Documents Re Cross-Default, by and

---

[5]  The Third Notice of Acceleration indicates, *inter alia*, that it was made pursuant to: (1) the 2011 Loan Documents, which were assigned to plaintiff; and (2) "[t]he Term Loan, Pledge and Security Agreement dated as of June 22, 2012 pursuant to which NDH loaned SRB Concession Inc. ("SRB Concession") $12,273,748.80, inclusive of interest . . . , and the Negotiable Promissory Note evidencing that loan, dated June 22, 2012 . . . ['the 2012 Loan Documents'],"  which were assigned to Phoenix Life Insurance Company ("Phoenix").  (Am. Compl., Ex. G).

[6]  Paragraph 9 of the Security Agreement provides, in pertinent part, that "[a]n Event of Default shall occur if: (a) [SRB Convention] shall fail to pay within five (5) business days after the date due, whether at maturity, by acceleration or otherwise, any installment on the [2011] Note; or (b) [SRB Convention] shall fail to observe or perform any of its covenants contained herein, and such failure shall continue for a period of thirty (30) days after written notice from [NDH or plaintiff] to [SRB Convention]; or (c) An event of default shall occur under the Concession Agreement, and shall not be cured within the applicable cure period; or (d) Any representation, warranty, certification or statement made by [SRB Convention] in this [Security] Agreement, or in any certificate, financial statement or other document delivered to [NDH or plaintiff] pursuant

between SRB Convention, SRB Concession, NDH, [the Town], and [plaintiff], dated June 22, 2012[7].)

**PLEASE TAKE NOTICE THAT** pursuant to Paragraph 10(b) of the November 18, 2011 [Security] Agreement you have ten (10) days from receipt of this letter (the 'Cure Period') to cure all Events of Default.

That cure must include the payment of all outstanding amounts due, plus interest at the 'Default Rate' (as defined in the Loan Documents) from the date the payment was due to the date of cure, plus the attorneys' fees and costs due under the Loan Documents.  (See, e.g. November 18, 2011 [Security] Agreement at Paragraphs 3(b), 9 & 10(b).)

Therefore, in order to cure the defaults under the Loan Documents, the following must be done within ten days from receipt of this letter:

. . .

(iii) SRB Convention must pay to [plaintiff] by good certified or bank cashier's check the October payment of $73,529.42, plus Default Interest of $24.17 per day from October 19, 2015 until the date the payment is tendered; and

---

to or in connection with this [Security] Agreement or the making of the [2011] Loan shall prove to have been misleading or incorrect in any material respect when made and shall fail to have been cured within thirty (30) days of notice thereof to [SRB Convention] and the Town and shall remain material; or (e) [SRB Convention] or the Town commence [sic] a voluntary case or other proceeding seeking dissolution, liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any action to authorize any of the foregoing; or (f) An involuntary case or other proceeding shall be commenced against [SRB Convention] or the Town seeking dissolution, liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, and such involuntary case or other proceeding shall remain undismissed for a period of 60 days."  (Am. Compl., Ex. D, ¶ 9).

[7]  Plaintiff did not attach a copy of the June 22, 2012 Letter Amendment to the amended complaint, and neither party makes any reference to it.

> (iv) SRB Convention must pay to [plaintiff] the attorneys' fees referenced in the Prior Notices of Acceleration plus additional attorneys' fees subsequently incurred in the amount of $22,019.
>
> Without prejudice to . . . [plaintiff's] rights to acceleration as a result of the Prior Notices of Acceleration, if SRB Convention . . . fail[s] to cure all Events of Default within ten (10) days from receipt of this letter, the full Acceleration Amount (as defined in the Loan Documents) will become immediately due and payable, without further notice or demand, with interest thereon at the Default Rate, together with legal fees and costs of suit and enforcement.
>
> For your information, the Acceleration Amount shall be equal to the sum of (i) any past due payments plus Default Interest and the attorneys' fees specified in the Prior Notices of Acceleration, plus (ii) $5,290,654.76, which is the sum as of the last day of the Cure Period of the remaining payments due under the [2011] Loan Documents, discounted to their present value in accordance with the terms of the [2011] Loan Documents."

(Am. Compl., Ex. G) (emphasis omitted).

On or about February 26, 2016, Phoenix, on behalf of plaintiff, sent the Town a "Loan Default Notice," indicating, in pertinent part:

> "This letter will serve to inform you that neither SRB Concession nor SRB Convention has cured the defaults referenced in the [November 19, 2015 Third Acceleration Notice] and, accordingly, the full Acceleration Amount (as defined in the November 18, 2011 Loan Agreement) is now due and payable along with, but not by way of limitation, accruing default interest, attorneys' fees, and costs of suit.
>
> . . .
>
> At present, the Prepayment Amount due under the November 18, 2011 Loan Agreement is calculated [to be five million four hundred thousand two hundred fifty-two dollars and seventy-seven cents ($5,400,252.77)].
>
> . . .
>
> In accordance [with Section 32 of the FACA, as amended by the SACA], PHL hereby demands payment from [the Town] of the Termination Payment. Such payment is, pursuant to the [FACA, as amended by the SACA], to be made, in one

lump sum, within sixty (60) days of your receipt of this notice. . . ."

(Am. Compl., Ex. H) (emphasis omitted). Plaintiff alleges that it is an intended third-party

beneficiary of the FACA, as amended by the SACA, (*id.*, ¶ 39); that the Town terminated the

Concession Agreement, but "failed and/or refused to remit the Termination Payment to PHL, all

in violation of the terms of the Concession Agreement (as amended)[,]" (*id.*, ¶ 37 and ¶ 36 at p.

12); and that the amount due and owing under the 2011 Loan Documents, as of June 1, 2016, is

six million two hundred fifty-two thousand six hundred twenty-three dollars and eighty-two cents

($6,252,623.82), with additional amounts accruing "with the passage of time." (*Id.*, ¶ 38).


B.     Procedural History

On or about July 19, 2016, plaintiff commenced this action against defendant pursuant to

this Court's diversity of citizenship jurisdiction under 28 U.S.C. § 1332,  asserting claims

seeking damages for breach of contract, unjust enrichment, fraud, innocent misrepresentation and

negligent misrepresentation.  On July 27, 2016, plaintiff filed an amended complaint asserting

the following claims: (1) that the Town breached the Concession Agreement, as amended, by

failing and refusing to pay plaintiff the Termination Payment (first cause of action for breach of

contract), (*see* Am. Compl., ¶ 40); (2) that "to the extent the Termination Payment is, for some

reason, not properly payable to [the Town], the provisions requiring payment of the Cause

Termination Payment to [plaintiff]" were triggered, yet the Town "has failed to remit the Cause

Termination Payment to [plaintiff], all in violation of the terms of the Concession Agreement (as

amended)" (second cause of action for breach of contract), (*id.*, ¶¶ 36-37 at p. 12, Count II)

(emphasis omitted); (3) that the Town "was unjustly, unfairly and inequitably enriched to the

extent [plaintiff's] funds were utilized to improve and/or operate the Facilities[,] . . . at the
expense and to the detriment of [plaintiff][,]" and "[b]oth equity and good conscience dictate that
[it] should reimburse [plaintiff] for any improvements to the Facilities made by SRB with
[plaintiff's] funds" (third cause of action for unjust enrichment) (*id.*, ¶¶ 35-37 at p. 12, Count III);
(4) that "[t]o the extent [the Town] is correct with respect to the legal assertions contained within
the Genova Letter, it necessarily follows that" Garry's representations in the Harris Beach Letter,
Mei's representations in the Mei Letter and Genova's representation in the SACA that the Town
"has agreed to amend the [FACA] to provide for payment of certain amounts under that
Agreement to [plaintiff] should SRB default in its obligations to [plaintiff]," all of which were
made for the benefit, or on behalf, of the Town, were untrue, and NDH and plaintiff reasonably
relied to their detriment on those representations by funding the Loan, which "is presently
uncollectable from SRB" (fourth, fifth and tenth causes of action for innocent misrepresentation),
(*id.*, ¶¶ 40-43 at p. 14; ¶¶ 40-43 at p. 16; ¶¶ 36-37 and 39-41 at pp. 22-23, respectively) (italics
and brackets omitted); (5) that Harris Beach, Mei and Genova, acting for the benefit, or on
behalf, of the Town, knew or should have known that the representations in the Harris Beach
Letter, Mei Letter and SACA, respectively, were untrue, and NDH and plaintiff reasonably relied
to their detriment on those representations by funding the Loan, which "is presently uncollectable
from SRB" (sixth, seventh and eleventh causes of action for negligent misrepresentation), (*id.*, ¶¶
41-44 at p. 17; ¶¶ 41-44 at p. 18; and ¶¶ 40-42 at p. 24, respectively) (italics omitted); and (6)
that Harris Beach, Mei and Genova, acting for the benefit, and on behalf, of the Town, and "in
reckless disregard of the truth," "stated facts that were claimed to be known as true" in the Harris
Beach Letter, Mei Letter and SACA, respectively, "when, in point of fact, [they] had no

reasonable basis for" making those representations, knowing and intending that NDH and/or plaintiff would rely on those assertions, and NDH and plaintiff reasonably relied to their detriment on those representations by funding the Loan, which "is presently uncollectable from SRB" (eighth, ninth and twelfth causes of action for fraud), (*id.*, ¶¶ 41-46 at pp. 19-20; ¶¶ 41-46 at p. 21; and ¶¶ 40-44 at p. 25, respectively) (italics omitted).

Defendant now moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiff's claims against it in the amended complaint for failure to state a claim for relief.

## II.     DISCUSSION

### A.     Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S. Ct. 1937. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*; *see also Ruston v. Town Bd. of Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-1 (2d Cir. 2010); *accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 729-30 (2d Cir. 2013). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014). Accordingly, the Court has not considered any of the extrinsic evidence submitted by the parties in support of, or in opposition to, defendant's motion to dismiss.

B.      Breach of Contract Claims

Under New York law, "[p]arties asserting third-party beneficiary rights under a contract must establish (1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for their benefit and (3) that the benefit to them is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate them if the benefit is lost[.]" *Mendel v. Henry Phipps Plaza West, Inc.*, 6 N.Y.3d 783, 786, 811 N.Y.S.2d 294, 844 N.E.2d 748 (N.Y. 2006) (quotations, alterations and citation omitted); *accord Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 181-82, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (N.Y. 2011).

1.      Existence of a Valid and Binding Contract

"[A] municipality's power to contract is statutorily restricted for the benefit of the

public." *Genesco Entm't, a Div. of Lymutt Indus., Inc. v. Koch*, 593 F. Supp. 743, 748 (S.D.N.Y. 1984); *see also Scarborough Props. Corp. v.. Village of Briarcliff Manor*, 278 N.Y. 370, 375-76, 16 N.E.2d 369 (N.Y. 1938) ("The power of a [municipality] to enter into contracts and to incur financial obligations is subject to statutory conditions and restrictions intended to protect the inhabitants and taxpayers against ill-considered or extravagant action.")  "Town Law § 64(6) demands that a formal resolution be passed by the Town Board and executed by the Town Supervisor in the name of the Town before a Town can be bound by any contract." *Verifacts Grp., Inc. v. Town of Babylon*, 267 A.D.2d 379, 379, 700 N.Y.S.2d 75 (N.Y. App. Div. 1999); *see also Glenville Police Benevolent Ass'n v. Mosher*, 31 A.D.3d 874, 875, 816 N.Y.S.2d 915 (N.Y. App. Div. 2006) ("Town Law § 64(6) makes abundantly clear that a town cannot be bound contractually unless the contract has been approved by the town board and executed by the supervisor in the town's name.")  "Absent strict compliance with the formal requirements of this statute, no valid contract binding a Town may be found to exist." *Verifacts*, 267 A.D.2d at 379, 700 N.Y.S.2d 75; *see also Granada Bldgs., Inc. v. City of Kingston*, 58 N.Y.2d 705, 708, 458 N.Y.S.2d 906, 444 N.E.2d 1325 (N.Y. 1982) ("Municipal contracts which violate express statutory provisions are invalid[.]"); *Mans Constr. Oversite, Ltd. v. City of Peekskill*, 114 A.D.3d 911, 911-12, 980 N.Y.S.2d 822 (N.Y. App. Div. 2014) ("A municipal contract which does not comply with statutory requirements or local law is invalid and unenforceable[.]" (quotations and citation omitted)); *Goldberg v. Penny*, 163 A.D.2d 352, 353 (N.Y. App. Div. 1990) ("It is fundamental that a municipality can only contract for an authorized purpose and then only in the manner provided by statute.")  Indeed, to allow recovery under a contract which contravenes statutory restrictions on a municipality's power to contract "gives vitality to an illegal act and

grants the municipality power which it does not possess 'to waive or disregard requirements which have been properly determined to be in the interest of the whole.'" *Genesco Entm't*, 593 F. Supp. at 748 (quoting *Lutzken v. City of Rochester*, 7 A.D.2d 498, 499, 184 N.Y.S.2d 483 (N.Y. App. Div. 1959)); *see also City of New York v. City Merch., Inc.*, 211 F. App'x 44, 46 (2d Cir. Jan. 8, 2007) (summary order) ("When a statute is . . . designed to protect the public from governmental misconduct or improvidence, . . . its requirements cannot be waived[.]" (quotations and citations omitted)). "A party contracting with a municipality is chargeable with knowledge of the statutes which regulate its contracting powers and is bound by them[.]" *Parsa v. State of New York*, 64 N.Y.2d 143, 147, 485 N.Y.S.2d 27, 474 N.E.2d 235 (N.Y. 1984); *see also Field Day, LLC v. County of Suffolk*, 799 F. Supp. 2d 186, 195 (E.D.N.Y. 2011) (accord); *Town of Oneonta v. City of Oneonta*, 191 A.D.2d 891, 892, 594 N.Y.S.2d 838 (N.Y. App. Div. 1993) ("The powers of a municipal corporation are wholly statutory and every person who deals with such a body is bound to know the extent of its authority and the limitations on its power[.]")

Since there is no indication in the amended complaint that the SACA was ever approved by the Town Supervisor or ratified by the Town Board, the amended complaint fails to state a plausible claim that a valid and binding contract existed between SRB Convention and the Town that was intended for plaintiff's benefit. *See, e.g. Merrick Gables Ass'n, Inc. v. Town of Hempstead*, 691 F. Supp. 2d 355, 363 (E.D.N.Y. 2010) (dismissing the plaintiffs' breach of contract claim because there was no indication that the alleged agreement were ever approved by the Hempstead Town Supervisor or ratified by the Hempstead Town Board); *Plaza Drive Grp. of CNY, LLC v. Town of Sennett*, 115 A.D.3d 1165, 982 N.Y.S.2d 610 (N.Y. App. Div. 2014) (granting judgment in favor of the Town of Sennett declaring that a certain unsigned letter

agreement was not a binding contract and was unenforceable against it because the plaintiff had

not alleged that the Sennett Town Board considered or approved the letter agreement as required

by [N.Y.] Town Law § 64(6) so as to establish a valid contract.)  Indeed, it is clear from the

documents attached to the amended complaint that, unlike the Concession Agreement, the FACA

and the Extension Agreement, which were all executed by Venditto as the then-Town Supervisor,

the SACA was executed by Genova, as the then-Town Attorney; not by the Town Supervisor.

(*See* Am. Compl., Ex. F).  In addition, although the Harris Beach Letter, the Mei Letter and the

SACA refer to the Town Resolutions approving the prior agreements relating to the SACA, (*see*

*id.*, Exs. F, I and K), there is no indication in those documents, the pleadings or any of the other

documents attached to the amended complaint that the Town Board ever passed a Town

Resolution approving the SACA.[8]

The unreported decision and order of the New York State Supreme Court, County of

Nassau, *Atalaya Asset Income Fund II LP v. HVS Tappan Beach Inc.*, No. 600517-16 (N.Y. Sup.

Ct. Oct. 12, 2016), upon which plaintiff relies, is not binding on this Court and, in any event, is

---

[8]  Even were the Court to consider Town Resolution No. 256-2010, which plaintiff submitted in
opposition to defendant's motion to dismiss, that resolution merely "authorized and directed" the
Town Supervisor "to enter into an agreement with [SRB Convention's and SRB Concession's]
bank relating to the loan, and an agreement with [SRB Convention and SRB Concession]
regarding the use of the loan proceeds at [the Golf Course and TOBAY Beach], *subject to the
negotiation of acceptable terms in said agreements*."  (Plaintiff's Memorandum of Law in
Opposition to Defendant's Motion to Dismiss ["Plf. Opp."], Ex. D) (emphasis added).  That
resolution is nothing more than an unenforceable "agreement to agree, in which . . . material
term[s] [are] left for future negotiations[.]" *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd.
Corp.*, 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 575 N.E.2d 104 (N.Y. 1991); *see also Shepherd v.
Whispering Pines Inc.*, 188 A.D.2d 786, 789 (N.Y. App. Div. 1992) (holding that the Town's
resolution authorizing the Town Board to enter into an agreement for the purchase of a
campground constituted an unenforceable "agreement to agree.")  Moreover, there is no
indication that that resolution, which was adopted in March 2010, is related in any way to the
loan plaintiff made to SRB Convention in November 2011, almost two (2) years later.

inapposite.  In that case, the Town claimed, in relevant part, that the agreement at issue between the parties "although apparently signed by John Vendito [sic], Supervisor," was not enforceable; and submitted on its motion to dismiss, *inter alia*, an affidavit from Venditto indicating that he did not recall signing the agreement and that it was his understanding that the document was not authorized by a Town Board Resolution.  (Plf. Opp., Ex. A at 7).  In opposition to the Town's motion to dismiss, the plaintiff claimed, in relevant part, "that the tepid affidavit[] of Venditto . . . [was] insufficient to overcome the presumption of validity of [his] notarized signature[] on the document[.]" (*Id.*)  Thus, in that case, unlike this one, there appeared to be a valid and binding contract on the face of the pleadings and the agreement at issue sufficient to state a cause of action against the Town for breach of contract.  However, in this case, it is clear from the face of the pleadings and the documents attached thereto, and without resorting to any extrinsic evidence, that the SACA was never signed or executed by the Town Supervisor, nor ratified by the Town Board.[9]  Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's breach of contract claims against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's breach of contract claims in the amended complaint (first and second causes of action) are dismissed in their entirety with prejudice for failure to state a claim

---

[9]  Since "a plaintiff cannot amend his complaint by asserting new facts or theories for the first time in opposition to a motion to dismiss[,]" *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) (quotations, alterations and citation omitted); *accord Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 526-27 (S.D.N.Y. 2015), the Court has not considered plaintiff's contentions that "even if there was no town board resolution, [it] would still be entitled to pursue its breach claim on a theory of ratification," which is a question of fact.  (Plf. Opp. at 11).  Plaintiff does not assert such a claim in the amended complaint; nor are there any factual allegations from which such a claim may reasonably be inferred.  *See generally Seif v. City of Long Beach*, 286 N.Y. 382, 386-87, 36 N.E.2d 630 (N.Y. 1941).

for relief.[10]

C.       Unjust Enrichment Claim

"Where the Legislature provides that valid contracts may be made only by specified officers or boards and in specified manner, no implied contract to pay for benefits furnished by a person under an agreement which is invalid because it fails to comply with statutory restrictions and inhibitions can create an obligation or liability of the [municipality]. . . . The creation of an obligation against the town, by way of contract, cannot be founded upon omission of action by the town officials, but must be the result of an affirmative determination to create the obligation in the form and manner provided by statute." *New York Tel. Co. v. Town of N. Hempstead*, 41 N.Y.2d 691, 696, 395 N.Y.S.2d 143, 363 N.E.2d 694 (N.Y. 1977) (quotations and citations omitted). "[E]quitable powers of the courts may not be invoked to sanction disregard of statutory safeguards and restrictions." *Seif*, 286 N.Y. at 387-88, 36 N.E.2d 630. Accordingly, "[a]s a general rule, a claim against a municipality in *quantum meruit* will not lie where the original contract is void as contrary to statute or *ultra vires*[.]" *Vrooman v. Village of Middleville*, 91 A.D.2d 833, 834, 458 N.Y.S.2d 424 (N.Y. App. Div. 1982), *lv. denied*, 58 N.Y.2d 610, 462 N.Y.S.2d 1028, 449 N.E.2d 427 (N.Y. 1983).

However, a limited exception to that general rule exists, *see Mans Constr.*, 114 A.D.3d at 912, 980 N.Y.S.2d 822; *Mid-Atlantic Perfusion Assocs., Inc. v. Westchester County Health Care Corp.*, 54 A.D.3d 831, 832-33, 864 N.Y.S.2d 100 (N.Y. App. Div. 2008), insofar as "[a] plaintiff

---

[10]  In light of this determination, it is unnecessary to consider defendant's remaining contention seeking dismissal of plaintiff's breach of contract claims on the basis that the SACA is unenforceable because it violates section 1 of Article VIII of the New York State Constitution.

is entitled to recover from a municipality where . . . he has entered into a contract in good faith, the municipality possesses the authority to enter into the contract, the contract is not violative of public policy and the circumstances indicate that if plaintiff is not compensated, the municipality would be unjustly enriched[.]" *Vrooman*, 91 A.D.2d at 834, 458 N.Y.S.2d 424. "The policy underlying the rule against holding municipalities liable on an implied contract theory is that of safeguarding the taxpayers' interest against extravagance and collusion on the part of public officials by requiring municipalities to abide by statutory restrictions on their contractual authority[.]" *Id.* (quotations and citation omitted).

The limited exception to the general rule does not apply in this case. Neither plaintiff nor SRB Convention were "providing services at the behest of a higher State authority," as in *Vrooman*.[11] Rather, plaintiff and SRB Convention were "always in an arms-length relationship with the [Town]." *Housing Works v. Turner*, 179 F. Supp. 2d 177, 214 (S.D.N.Y. 2001), *aff'd on other grounds*, 56 F. App'x 530 (2d Cir. Jan. 3, 2003). Furthermore, unlike the case *Aniero*

---

[11] In *Vrooman*, after the New York State Department of Health had directed the defendant-village "to cease and abate the discharge of sewage and other wastes into the waters of the State and to submit plans for sewage treatment facilities[,]" the Village entered into an agreement with the plaintiff "to provide engineering services in the design and planning of the sewage treatment facility." *Vrooman*, 91 A.D.2d at 833-34, 458 N.Y.S.2d 424. Although the plaintiff performed the design and planning services and obtained State approval of its plans, the Village failed to pay its verified claim. At trial, "the Village stipulated that the amount stated in the complaint was the proper valuation for the services rendered [by the plaintiff]." *Id.* at 834. The Supreme Court of the State of New York, Appellate Division, Fourth Judicial Department, found that the policy underlying the general rule against holding municipalities liable on an implied contract or unjust enrichment theory would not be contravened in that case because "[t]he Village was ordered by the State to develop a sewage treatment system and the services provided by [the] plaintiff were essential to effectuate that directive[;] [t]here [was] no dispute as to the[] value [of those services] and no harm to the taxpayers[;] and "[t]o absolve the municipality from liability, particularly when it ha[d] been significantly benefited [sic] by [the] plaintiff's services, would encourage disregard of the statutory safeguards by municipal officials." *Id.*

*Concrete Co., Inc. v. New York City Constr. Auth.*, No. 94-cv-3506, 2000 WL 863208 (S.D.N.Y.

June 27, 2000), upon which plaintiff relies, "it cannot be said that [either plaintiff or SRB

Convention] was merely stepping in mid-project to complete a contract that had already been

approved and registered by another party."[12] *Housing Works*, 179 F. Supp. 2d at 214. Under the

---

[12] In *Aniero*, the plaintiff was the contractor selected by the Aetna Casualty and Surety Company
("Aetna") to complete construction of a project to renovate a public school in the Bronx upon the
mid-project default of the original contractor, whose performance Aetna secured under a
performance and payment bond. *Aniero*, 2000 WL 863208, at * 1. After nine (9) months on the
project, the plaintiff ceased its work and commenced an action asserting, *inter alia*, a proposed
claim in quantum meruit against the New York City School Construction Authority ("the
NYCSCA"), the public benefit corporation that developed the project, to recover the
uncompensated value of its work. *Id.* The NYCSCA challenged the plaintiff's proposed
quantum meruit claim against it on the basis that since the plaintiff's work on the project was not
furnished pursuant to a contract awarded under the competitive bidding process required by that
New York Public Authorities Law ("PAL") §§ 1734-1735, it would violate public policy to hold
it liable under a quasi-contract theory. *Id.* at 12. The district court found that "neither the
governing PAL provisions nor any of the cases cited by [NYC]SCA can be read to bar quantum
meruit recovery for services rendered . . . by a completion contractor following the original
contractor's mid-project breach of a properly awarded contract, particularly absent any
suggestion that the procurement of either contractor's services involved dishonesty or improper
behavior." *Id.* The district court found that the circumstances for applying the exception to the
general rule that a plaintiff may not recover in equity or quasi-contract when a public contract is
deemed void because it was entered into in violation of applicable statutory restrictions
"abound[ed]" in that case because the NYCSCA complied with the applicable competitive
bidding statutes in awarding the only contract it executed with respect to the project, *i.e.*, the
contract with the original contractor; that after the original contractor defaulted, the NYCSCA
invoked the terms of the performance bond that it had required the original contractor to obtain to
request that Aetna complete performance of the contract; that Aetna engaged the plaintiff as a
completion contractor pursuant to the performance bond; and that "[n]othing in the record or the
allegations suggest[ed] that the procurement or the performance of [the plaintiff's] services
implicate[d] the integrity of the process of awarding public construction contracts." *Id.* at 14-16.
Moreover, the court found that NYCSCA's "compliance with the applicable regulations in
awarding the [contract with the original contractor] satisfie[d] the public policy underlying the
regulations and sanction[ed] payments made by [NYC]SCA to a completion contractor after the
initial contractor's default," *id.* at 14; and that allowing the plaintiff to recover against the
NYCSCA in quantum meruit would not undermine the policy, as relevant here, "of preventing
extravagance and collusion on the part of public officials," which underlies the general rule. *Id.*
at 16. None of the circumstances warranting the limited exception to the general rule that the
district court found "abound[ed]" in *Aniero* are present in this case.

circumstances of both of the cases in which the limited exception to the general rule was applied, the court found that the quasi-contract theory asserted therein would not undermine the public policy underlying the general rule, *i.e.*, the protection of the Town's "inhabitants and taxpayers against ill-considered or extravagant action." *Scarborough Props.*, 278 N.Y. at 375-76. No such circumstances are present in this case. Accordingly, under the circumstances of this case, "the general rule prohibiting unjust enrichment claims against municipalities applies." *Housing Works*, 179 F. Supp. 2d at 214.

Moreover, "[u]nder New York law, a plaintiff may prevail on a claim for unjust enrichment by demonstrating (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Nordwind v. Rowland*, 584 F.3d 420, 434 (2d Cir. 2009) (quotations and citation omitted). "The essence of such a claim is that one party has received money or a benefit at the expense of another[,]" *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (quotations and citation omitted), and "[t]he essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered[.]" *Paramount Film Distrib. Corp. v. State*, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 (N.Y. 1972); *see also Regnante v. Securities & Exch. Officials*, 134 F. Supp. 3d 749, 772 (S.D.N.Y. 2015) ("[I]n order to state an unjust enrichment claim, a plaintiff must show that the defendant actually received a benefit[,] . . . . [and the] benefit must be both 'specific' and 'direct.'"[13] (citations omitted)). "Generally, courts

---

[13] "For the benefit to be 'direct,' the defendant must either be put in possession of the benefit, or otherwise obtain financial relief because of the benefit; it is not enough that the funds 'indirectly' benefit the defendant . . . . [A] benefit is direct when it or its functional equivalent is in the defendant's possession to return." *Buchwald v. Renco Grp.*, 539 B.R. 31, 49-50 (S.D.N.Y. 2015).

will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent[.]" *Paramount Film*, 30 N.Y.2d at 421, 334 N.Y.S.2d 388. "[U]njust enrichment is not a catchall cause of action to be used when others fail[] . . . [and] is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790, 944 N.Y.S.2d 732, 967 N.E.2d 1177 (N.Y. 2012).

The amended complaint is bereft of any factual allegations from which it may reasonably be inferred that defendant actually received any specific and direct benefit at plaintiff's expense, *i.e.*, that the Town, itself, received any benefit from the loan plaintiff made to SRB Convention in November 2011. Indeed, the amended complaint alleges only that the Town was unjustly enriched "to the extent [plaintiff's] funds were utilized to improve and/or operate the Facilities," and that "equity and good conscience dictate that [the Town] should reimburse [plaintiff] for any improvements to the Facilities made by SRB with [plaintiff's] funds."[14] (Am. Compl., ¶ 35 at p. 12). There is no indication that any of the proceeds of the loan plaintiff made to SRB Convention in November 2011 were actually utilized in any way to bestow a direct benefit upon the Town. Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's unjust enrichment claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted

---

[14] Even in its opposition to defendant's motion, plaintiff does not assert that the Town received any direct benefit from its loan to SRB Convention. Rather, plaintiff non-committally asserts that "*any* PHL funds that were utilized to improve or operate the Facilities were, by definition, essential to its public purpose . . . ." (Plf. Opp. at 17) (emphasis added).

and plaintiff's unjust enrichment claim (third cause of action) is dismissed in its entirety with prejudice for failure to state a claim for relief.

        D.     Fraud Claims

"To state a claim for fraud under New York law, a plaintiff must allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." *Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402 (2d Cir. 2015); *Mandarin Trading*, 16 N.Y.3d at 178, 919 N.Y.S.2d 465 ("Generally, in a claim for fraudulent misrepresentation, a plaintiff must allege a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury[.]" (quotations and citation omitted)); *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (N.Y. 1995) ("The essential elements of a cause of action for fraud are representation of a material existing fact, falsity, *scienter*, deception and injury[.]" (quotations and citation omitted)).

"To plead a claim for fraud in the inducement or fraudulent concealment, plaintiff must allege facts to support the claim that it justifiably relied on the alleged misrepresentations." *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 25 N.Y.3d 1043, 1044, 10 N.Y.S.3d 486, 32 N.E.3d 921 (N.Y. 2015); *see also Paraco Gas Corp. v. Travelers Cas. & Sur. Co. of Am.*, 51 F. Supp. 3d 379, 393 (S.D.N.Y. 2014) ("[T]o prevail on a claim of fraud, a plaintiff must show that it actually

relied on the purported fraudulent statements and that its reliance was reasonable or justifiable." (quotations and citation omitted)); *Nabatkhorian v. Nabatkhorian*, 127 A.D.3d 1043, 1044, 7 N.Y.S.3d 479 (N.Y. App. Div. 2015) ("An essential element of any fraud claim is that there must be reasonable reliance, to a party's detriment, upon the representations made by the defendant against whom the fraud claims has been asserted[.]" (quotations, alterations and citations omitted)). "The plaintiff must show a belief in the truth of the representation and a change of position in reliance on that belief." *Nabatkhorian*, 127 A.D.3d at 1044. 7 N.Y.S.3d 479.

"[I]f the facts represented are not matters peculiarly within the defendant's knowledge, and the plaintiff has the means available to it of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, the plaintiff must make use of those means, or it will not be heard to complain that it was induced to enter into the transaction by misrepresentations[.]" *ACA Fin.*, 25 N.Y.3d at 1044, 10 N.Y.S.3d 486 (quotations, alterations and citation omitted). Moreover, "[w]here sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." *Crigger v. Fahnestock & Co., Inc.*, 443 F.3d 230, 235 (2d Cir. 2006) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984)).

The fact that the SACA was executed by Genova, in his capacity as the then-Town Attorney, and not by the Town Supervisor, as the Concession Agreement, FACA and Extension Agreement had been, is readily discernible from the face of that document. Moreover, the Harris Beach Letter, the Mei Letter and the SACA itself, all reference the Town Resolutions approving the prior agreements relating to the SACA, yet omit any reference to a Town Resolution

approving the SACA.  As indicated above, "[a] party contracting with a municipality is chargeable with knowledge of the statutes which regulate its contracting powers and is bound by them[.]" *Parsa*, 64 N.Y.2d at 147, 485 N.Y.S.2d 27.  "Those dealing with officers or agents of municipal corporations must at their peril see to it that such officers or agents are acting within their authority . . . and they have no right to presume that the persons with whom they are dealing are acting within the line of their authority[.]" *City of Zanesville, Ohio v. Mohawk Data Scis. Corp.*, 97 A.D.2d 64, 66, 468 N.Y.S.2d 271 (N.Y. App. Div. 1983); *see also Casa Wales Housing Dev. Fund Corp. v. City of New York*, 129 A.D.3d 451, 451, 11 N.Y.S.3d 31 (N.Y. App. Div. 2015), *lv. denied*, 26 N.Y.3d 917, 26 N.Y.S.3d 762, 47 N.E.3d 92 (N.Y. 2016) ("[T]hose dealing with municipal agents must ascertain the extent of the agents' authority, or else proceed at their own risk[.]"); *Walentas v. New York City Dep't of Ports*, 167 A.D.2d 211, 212, 561 N.Y.S.2d 718 (N.Y. App. Div. 1990), *lv. denied*, 78 N.Y.2d 857, 574 N.Y.S.2d 938, 580 N.E.2d 410 (N.Y. 1991) ("[I]t is solely at his peril that . . . a party presumes that the persons with whom he is dealing are acting within the scope of their authority and, since the extent of that authority is a matter of public record, there is a conclusive presumption that he is aware of it.") "Even where municipalities have accepted benefits, they will not be held liable under unauthorized agreements[.]" *Goldberg*, 163 A.D.2d at 353, 558 N.Y.S.2d 564; *see also Parsa*, 64 N.Y.2d at 147 ("[T]he State's acceptance of benefits furnished under a contract made without authority does not estop it from challenging the validity of the contract or from denying liability pursuant to it[.]"); *Seif*, 286 N.Y. at 387, 36 N.E.2d 630 ("Mere acceptance of benefits by the city under a contract made without authority does not estop a municipal corporation from challenging the validity of the contract and from denying liability for materials furnished or services rendered

under a contract not made or ratified by a board or officer acting under authority conferred by law

and in the manner prescribed by law."). "Although application of this rule results in occasional

hardship, it has been held that the loss should be ascribed to the negligence of the person who

failed to ascertain the authority vested in the public agency with whom he dealt and statutes

designed to protect the public should not be annulled for his benefit." *City of Zanesville*, 97

A.D.2d at 67 (quotations and citation omitted); *see also Parsa*, 64 N.Y.2d 143, 147, 485

N.Y.S.2d 27 ("Even though a promise to pay may be spelled out from the parties' conduct, a

contract between them may not be implied to provide 'rough justice' and fasten liability on the

State when applicable statutes expressly prohibit it . . . . The result may seem unjust but any other

rule would completely frustrate statutes designed to protect the public from governmental

misconduct or improvidence.")

The amended complaint fails to state plausible fraud claims against the Town based upon

the alleged misrepresentations of Garry in the Harris Beach Letter, Mei in the Mei Letter and

Genova in the SACA, relating to the validity and enforceability of the SACA, because, at most,

those representations are mere "misstatement[s] of a matter of law presumed to be so well within

the knowledge of plaintiff as to prevent if from being deceived thereby." *Steiner Egg Noddle Co.*

*v. City of New York*, 63 Misc.2d 163, 165, 311 N.Y.S.2d 406 (N.Y. App. Term 1969). In other

words, since, *inter alia*, the requirements of the New York Town Law § 64(6) are a matter of

public record, plaintiff is charged with knowledge of the fact that Genova, as the then-Town

Attorney, had no authority to execute the SACA, and that a valid and binding contract required

Town Board approval[15]; and since it is clear from the face of the SACA that it did not comply with the statutory requirements, plaintiff, which, at all times, was represented by counsel in connection with the transactions at issue, could not have reasonably relied upon the purported misrepresentations in the Harris Beach Letter, Mei Letter  SACA.  *See, e.g. Merrick Gables*, 691 F. Supp. 2d at 363 (dismissing fraud claim on the basis that it was not reasonable for the plaintiff to rely upon the town's alleged representation that it would act in a manner proscribed by federal law); *Michael R. Gianatasio, PE, P.C. v. City of New York*, 53 Misc.3d 757, 775 (N.Y. Sup. Ct. 2016) (dismissing the plaintiff's fraud claim because, *inter alia*, it "could have, and should have, been aware of the law requiring the job to be bid-out and could not justifiably rely on [the defendant's] invitation to work on a no-bid contract.")

Moreover, it is undisputed that Genova did not have authority to execute the SACA and "an unauthorized act of a public official precludes an action for deceit[.]" *Steiner*, 63 Misc. 2d at 166; *accord Brill v. Wagner*, 5 Misc.2d 768, 770, 161 N.Y.S.2d 490 (N.Y. Sup. Ct. 1957); *see also Lindlots Realty Corp. v. Suffolk County*, 278 N.Y. 45, 53, 15 N.E.2d 393 (N.Y. 1938) (holding that the fact "that the plaintiff had no right to rely upon an unauthorized act of a public official, since the authority of [that official] was a matter of record and [the] plaintiff is conclusively presumed to have known the extent of th[at] authority[,] . . . may preclude an action for deceit, [although] it does not bar rescission."); *Robinowitz v. City of White Plains*, 245 A.D.

---

[15]  The fact that the SACA was the only agreement of the four (4) agreements between the Town and SRB Catering and/or SRB Convention, to be executed by the Town Attorney, and not by the Town Supervisor; and that the Harris Beach Letter, Mei Letter and SACA all reference the specific Town Resolutions approving the prior agreements relating to the SACA, *i.e.*, the Concession Agreement, the FACA and the Extension Agreement, but omit any reference to a Town Resolution approving the SACA, is readily discernible from the face of those documents.

736, 738, 280 N.Y.S. 105 (N.Y. App. Div. 1935), *aff'd*, 269 N.Y. 670, 200 N.E. 50 (N.Y. 1936)

(granting the defendant's motion to dismiss the plaintiff's fraud claims against the city on the

basis, *inter alia*, that "[t]he alleged misrepresentations upon which the plaintiff [said] she relied

[were] predicated upon the doing of acts beyond scope of the authority of the officials who,

plaintiff claims, made them.")  Plaintiff's conclusory allegations that Harris Beach, Mei and

Genova acted "for the benefit of, and on behalf of," the Town, (*see* Am. Compl., ¶¶ 41 at pp. 14

and 16; ¶¶ 42 at pp. 17, 18, 19 and 21; and ¶ 37 at p. 22), in making the representations regarding

the validity and enforceability of the SACA and related documents, are insufficient to state a

plausible claim of reasonable reliance, particularly in light of the statutory limitation on the

authority of municipal employees to enter into contracts and incur financial obligations.  *See*

*Genesco Entm't*, 593 F. Supp. at 749 (construing the plaintiff's claim that it reasonably relied on

the representations of the deputy commissioner, the general counsel and the deputy general

counsel of the City to be "a claim that the negotiating parties, although without actual authority,

possessed apparent authority to enter into" the contract, but rejecting that claim on the basis that

"New York courts do not generally follow the doctrine of apparent authority in cases involving

municipal defendants . . . [because] [u]nlike a typical agency relationship, the authority of

municipal officers is a matter of record to which the public has ready access."); *NRP Holdings*

*LLC v. City of Buffalo*, No. 11-cv-472S, 2017 WL 745860, at * 13 (W.D.N.Y Feb. 27, 2017),

*appeal filed*, No. 17-783 (2d Cir. Mar. 20, 2017) (finding that the plaintiff was not entitled to rely

on the alleged promises in the . . . [l]etter [by a municipal official] . . . because [that official] did

not have the authority to make unconditional promises.  It is of little importance why the promise

exceeded the agent's power– whether it was an illegal promise, . . . or required legislative

36

approval, . . . the promise need only be outside the authority of the promisor."); *cf. Board of Educ. of Plainedge Union Free Sch. Dist. v. Connecticut Gen. Life Ins. Co.*, 309 F. Supp. 2d 416, 421 (E.D.N.Y. 2004) (holding that the principle "that apparent authority cannot bind a municipality[,] is limited to those circumstances where a municipal employee's authority is limited by statutes or regulations.")  Accordingly, the branch of defendant's motion seeking dismissal of plaintiff's fraud claims against it pursuant to Rule 12(b)(6) is granted and plaintiff's fraud claims (eighth, ninth and twelfth causes of action) are dismissed in their entirety with prejudice for failure to state a claim for relief.[16]

E.      Innocent and Negligent Misrepresentation Claims

"[A] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information[.]" *Mandarin Trading*, 16 N.Y.3d at 180, 919 N.Y.S.2d 465 (quotations, alterations and citation omitted); *see also Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) ("To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff

---

[16]  In light of this determination, it is unnecessary to consider defendant's remaining contentions seeking dismissal of plaintiff's fraud claims.

intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." (quotations and citation omitted)).

A claim for "innocent misrepresentation" is, in essence, a claim for "rescission based on fraud[,]" in which, "unlike a cause of action in damages on the same ground, proof of scienter and pecuniary loss is not needed." *D'Angelo v. Bob Hastings Oldsmobile, Inc.*, 89 A.D.2d 785, 785, 453 N.Y.S.2d 503 (N.Y. App. Div. 1982), *aff'd*, 59 N.Y.2d 773, 464 N.Y.S.2d 724, 451 N.E.2d 471 (N.Y. 1983); *see also Seneca Wire & Mfg. Co. v. A.. Leach & Co.*, 247 N.Y. 1, 7-8, 159 N.E. 700 (1928) ("It is not necessary, in order that a contract may be rescinded for fraud or misrepresentation, that the party making the misrepresentation should have known that it was false. Innocent misrepresentation is sufficient, and this rule applies to actions at law based upon rescission as well as to actions for rescission in equity. . . . A distinction in the nature of the proof . . . does not exist between the action at law and the action in equity, but does exist between the action in rescission and the action for damages based upon fraud and deceit. Here there must be proof of willful and fraudulent misrepresentation, knowingly made, resulting in damage."); *Jack Kelly Partners LLC v. Zegelstein*, 140 A.D.3d 79, 85, 33 N.Y.S.3d 7 (N.Y. App. Div. 2016), *lv. dismissed*, 28 N.Y.3d 1103, 45 N.Y.S.2d 364, 68 N.E.3d 92 (N.Y. 2016) ("[F]raud sufficient to support the rescission requires only a misrepresentation that induces a party to enter into a contract resulting in some detriment; proof of scienter is not necessary and even an innocent misrepresentation is sufficient for rescission[.]"); *Steen v. Bump*, 233 A.D.2d 583, 584, 649 N.Y.S.2d 731 (N.Y. App. Div. 1996), *lv. denied*, 89 N.Y.2d 808, 655 N.Y.S.2d 887, 678 N.E.2d 500 (N.Y. 1997) ("When a party seeks rescission and not damages on the basis of fraud, proof of scienter is not necessary; even an innocent misrepresentation is sufficient for rescission[.]");

*Dygert v. Leonard*, 138 A.D.2d 793, 794, 525 N.Y.S.2d 436 (N.Y. App. Div. 1988) ("If the element of scienter is subtracted from a cause of action for fraud, the remainder constitutes innocent misrepresentation. . . . [I]nnocent misrepresentations may be sufficient to void a contract[.]")  Thus, in order to state a claim for innocent misrepresentation, that plaintiff must allege "that (a) the defendant misrepresented material facts; (b) that th[o]se representations were made to induce the plaintiff to enter into the . . . agreement; and (c) that the plaintiff entered into the agreement . . . in justifiable reliance on the said misrepresentations[.]" *Emerson Elec. Mfg. Co. v. Printed Motors, Inc.*, 252 N.Y.S.2d 600, 607-08 (N.Y. Sup. Ct. 1964); *see also West Side Fed. Sav. & Loan Ass'n of New York City v. Hirschfeld*, 101 A.D.2d 380, 385, 476 N.Y.S.2d 292 (N.Y. App. Div. 1984), *lv. denied*, 65 N.Y.2d 605, 493 N.Y.S.2d 1028, 482 N.E.2d 1230 (N.Y. 1985) (holding that in order to show innocent misrepresentation, the plaintiff must demonstrate "the misrepresentation by the defendants of a material fact made to induce the plaintiff to enter into the . . . agreement and upon which the plaintiff justifiably relied[.]"); *Albany Motor Inn & Rest., Inc. v. Watkins*, 85 A.D.2d 797, 798, 445 N.Y.S.2d 616 (N.Y. App. Div. 1981), *lv. denied*, 56 N.Y.2d 508, 453 N.Y.S.2d 1027, 439 N.E.2d 401 (N.Y. 1982) ("All that is required to state a cause of action for rescission of a contract based on fraud is to set forth the circumstances in detail showing that a false material misrepresentation was made and that plaintiff relied on the representation to his detriment.")

### 1.    Justifiable Reliance

The amended complaint fails to state plausible claims for negligent and innocent misrepresentation, *inter alia*, for the same reason plaintiff's fraud claims fail, to wit, the amended

complaint is devoid of any factual allegations from which it may reasonably be inferred that plaintiff justifiably relied upon the purported misrepresentations in the Harris Beach Letter, the Mei Letter and the SACA relating to the validity and enforceability of the SACA.[17]  *See, e.g. Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 291 n. 7 (S.D.N.Y. 1998) (dismissing claims for negligent and innocent misrepresentation "for lack of adequately pleading justifiable reliance.")  Accordingly, the branches of defendant's motion seeking dismissal of plaintiff's innocent and negligent misrepresentation claims against it pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure are granted and plaintiff's negligent and innocent misrepresentation claims (fourth through seventh, tenth and eleventh causes of action) are dismissed in their entirety with prejudice for failure to state a claim for relief.

2.      Special Relationship

Furthermore, in the commercial context, liability for negligent misrepresentations, "is

---

[17]  Moreover, since the only relief sought in amended complaint for the alleged misrepresentations, exclusive of interest and costs, is damages, (*see* Am. Compl., ¶¶ 43 at pp. 14 and 16; ¶ 41 at 23; and "Wherefore" Clause at 26), not rescission or reformation of the SACA, the amended complaint fails to state a plausible claim for innocent misrepresentation under New York law.  *See Sheridan Drive-In, Inc. v. State*, 16 A.D.2d 400, 407, 228 N.Y.S.2d 576 (N.Y. App. Div. 1962) ("[W]hile innocent misrepresentations are sufficient for rescission they cannot be the basis of a recovery of damages for fraud[.]"); *Lassiter v. Rellstab Assocs.*, 1 A.D.2d 672, 146 N.Y.S.2d 263 (N.Y. App. Div. 1955) (dismissing innocent misrepresentation claims on the grounds that the complaint did not seek "relief by way of reformation or rescission," but instead, "attempt[ed] to plead a cause of action to recover damages caused by innocent misrepresentations of fact," which action "does not lie.")  All of the cases cited by plaintiff in opposition to the branch of defendant's motion seeking dismissal of its innocent misrepresentation claims are inapposite, as, *inter alia*, they do not involve an innocent misrepresentation claim under New York law.

imposed only on those persons who possess unique or specialized expertise, or who are in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quotations, alterations and citation omitted). Since "an arm's length borrower-lender relationship [] does not support a cause of action for negligent misrepresentation[,] . . . even . . . if the parties are familiar or friendly[,]" *Greenberg, Trager & Herbst, LLP v. HSBC Bank USA*, 17 N.Y.3d 565, 578, 934 N.Y.S.2d 43, 958 N.E.2d 77 (N.Y. 2011), neither does the relationship between the lender and, in effect, the borrower's guarantor. *See Fidelity Nat'l Title Ins. Co. v. N.Y. Land Title Agency LLC*, 121 A.D.3d 401, 403, 994 N.Y.S.2d 76 (N.Y. App. Div. 2014) ("[A] special relationship of trust and confidence does not arise merely from an arm's-length business transaction . . . ." (quotations and citation omitted)); *Bank Leumi Trust Co. of N.Y. v. Block 3102 Corp.*, 180 A.D.2d 588, 589, 580 N.Y.S.2d 299 (N.Y. App. Div. 1992), *lv. denied*, 80 N.Y.2d 754, 587 N.Y.S.2d 906, 600 N.E.2d 633 (N.Y. 1992) ("The legal relationship between a borrower and a bank is a contractual one of debtor and creditor and does not create a fiduciary relationship between the bank and its borrower or its guarantors.") Since plaintiff's negligent misrepresentation claims involve sophisticated parties, represented at all times by counsel during the transactions at issue, that entered into an arm's length business transaction, a finding of a special relationship is precluded.[18] *See Landesbank Baden-Wurttemberg v. Goldman, Sachs &*

---

[18] Moreover, "[a]s a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it[.]" *UST Private Equity Inv'rs Fund, Inc. v. Salomon Smith Barney*, 288 A.D.2d 87, 88, 733 N.Y.S.2d 385 (N.Y. App. Div. 2001); *accord Landesbank Baden-Wurttemberg*, 821 F. Supp. 2d at 624. "The principle that sophisticated parties have a duty to exercise ordinary diligence and conduct an independent appraisal of the risk they are assuming, . . . has particular application where . . . the true nature of

*Co.*, 821 F. Supp. 2d 616, 624 (S.D.N.Y. 2011), *aff'd*, 478 F. App'x 679 (2d Cir. Apr. 19, 2012);

*Basis Pac-Rim Opportunity Fund v. TCW Asset Mgmt. Co.*, 124 A.D.3d 538, 539, 2 N.Y.S.3d

105 (N.Y. App. Div. 2015).

Contrary to plaintiff's contention, the case *RBS Citizens, N.A. v. Thorsen*, 71 A.D.3d

1108, 898 N.Y.S.2d 219 (N.Y. App. Div. 2012), does not hold that "[t]he furnishing by counsel

of an opinion establishes the existence of the 'special relationship' required in order to plead a

claim of negligent misrepresentation." (Plf. Opp. at 22). Rather, that case held: (1) that "[t]he

plaintiff alleged the existence of certain facts which, if true, would establish that the defendant

had a duty to use reasonable care to impact correct information to the plaintiff due to a special

relationship existing between the parties[,]" *id.* at 1109 (quotations and citation omitted), without

indicating what those "certain facts" were; and (2) that "[t]he plaintiff also alleged the existence

of certain facts which, if true, would establish" the other elements of a negligent

misrepresentation claim, *i.e.*, that "certain 'information' the defendant imparted to the plaintiff in

an opinion letter was false, and that the plaintiff reasonably relied on that information[.]" *Id.*

(quotations and citation omitted). Since the amended complaint does not allege any factual

allegations from which a special relationship between plaintiff and defendant, or the element of

justifiable reliance, may reasonably be inferred, the branch of defendant's motion seeking

---

the risk being assumed could have been ascertained from reviewing . . . publicly available
information[.]" *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185, 195, 941 N.Y.S.2d 59 (N.Y.
App. Div. 2012) (quotations, alterations and citation omitted). As noted above, plaintiff and/or
its counsel representing it during the transactions at issue, could easily have verified the
representations in the Harris Beach Letter, Mei Letter and SACA regarding the validity and
enforceability of the SACA and related documents, as the requirements for entering into a
municipal contract are a matter of public record and the failure of the SACA to comply with
those requirements is readily ascertainable from the face of that document.

dismissal of plaintiff's negligent misrepresentation claims pursuant to Rule 12(b)(6) of the

Federal Rules of Civil Procedure is granted and plaintiff's negligent misrepresentation claims are

dismissed in their entirety with prejudice for failure to state a claim for relief.[19]


III.     CONCLUSION

For the reasons set forth above, defendant's motion to dismiss plaintiff's claims against it

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted to the extent set

forth herein and plaintiff's claims against defendant in the amended complaint are dismissed in

their entirety with prejudice for failure to state a claim for relief.  The Clerk of the Court shall

enter judgment in favor of defendant and close this case.

SO ORDERED.

_____
        \s\
Sandra J. Feuerstein
United States District Judge


Dated:  May 30, 2017
        Central Islip, New York

---

[19]  In light of this determination, it is unnecessary to consider defendant's remaining contentions
seeking dismissal of plaintiff's tort claims against it.